HEINRICH SCHUELER, AS EXECUTOR OF THE ESTATE OF JULIA BARENFANGER, DECEASED, AND OTTO SCHUE-LER, PLAINTIFFS-RESPONDENTS, v. ALEXANDER STRELINGER, DEFENDANT-APPELLANT.

Argued September 21 and 22, 1964—Decided November 2, 1964.

*Mr. Robert J. C. McCoid* argued the cause for defendant-appellant (*Messrs. Schneider & Morgan,* attorneys).

*Mr. Leo Kaplowitz* argued the cause for plaintiffs-respondents.

The opinion of the court was delivered by

FRANCIS, J. Defendant Dr. Alexander Strelinger performed a subtotal gastrectomy on one Julia Barenfanger on June 17, 1960. In the operation about 60% of her stomach was removed. She died on July 3, 1960. Thereafter, plaintiff Heinrich Schueler, as executor of her estate, brought this action against the doctor alleging negligence in the care and treatment given, and seeking damages for pain and suffering and expenses to which she was subjected thereby after the operation and until her death. Recovery was sought also under the Death Act, *N. J. S.* 2A:31–1 *et seq.,* for the pecuniary loss suffered by her next of kin as the result of the death. Following a jury trial, verdicts of $8,000 for the death and

$2,000 for the antecedent pain and suffering were returned against the defendant. On appeal the Appellate Division, in an unreported opinion, affirmed the judgments. In doing so, however, it found no proof of actionable negligence on two of the three complaints made against Dr. Strelinger. As to the third it declared the evidence of departure from the accepted standard of care was sufficient to warrant determination of the issue by the jury. And, after examining the record, it concluded the jury verdicts could not be regarded as contrary to the weight of the evidence. Thereafter, we granted defendant's petition for certification. 41 *N. J.* 309 (1964).

## I.

Dr. Strelinger was licensed to practice medicine and surgery in the State of New York in 1928 and in New Jersey in 1929. In October 1929 he opened his office in Elizabeth, New Jersey and except for periods of graduate study and Army service, he has practiced in that city ever since. He is a specialist in surgery with some emphasis in gastroenterology.

Julia Barenfanger was 53 years of age at the time of her death. She first came to Dr. Strelinger as a patient in 1937. Their contacts thereafter are not significant until April 25, 1959 when she came to his office complaining of gas and a "sticky" pain in the upper part of the abdomen which had persisted for two years. She had heartburn, was very constipated and seemed to have a mass in the left perimetrium. Dr. Strelinger suggested that gastrointestinal studies be made. She did not return to the doctor until more than a year later when the complaints were more pronounced. The doctor told her of the likelihood of a tumor and the immediate need for the epigastric studies. On May 27, 1960 the studies were made. Examination of her stools revealed the presence of occult blood and the X-rays showed a pyloric lesion which Dr. Strelinger felt might be malignant. He advised her that she had some grave condition in her stomach and that an operation of a serious nature was necessary.

Before anything further was done, however, Dr. Strelinger
sent her to Dr. Isaac Gelber, a specialist in diseases of the
stomach and intestinal tract, for examination and diagnosis.
Dr. Gelber's independent studies, including X-ray and fluoro-
scopic examination, showed an ulcer crater on the stomach
side of the pylorus. This location was important because an
ulcer there carries a substantial incidence of malignancy;
about 25% of the cases are malignant. His diagnosis was that
Mrs. Barenfanger had a pyloric ulcer, probably benign, but
malignancy (neoplastic infiltration) could not be excluded.
The possibility of malignancy was an important consideration
because of her history of recent 12-pound weight loss, loss of
appetite, and the presence of blood in the stools. In Dr. Gel-
ber's opinion, the condition could not be treated medically
and Mrs. Barenfanger should be given the benefit of imme-
diate surgery. He recommended a stomach resection which
involved removal of $\frac{1}{2}$ to $\frac{3}{4}$ of the stomach. "Immediate"
surgery did not mean the next day, but rather within the next
week, ten days or perhaps two weeks in the discretion of the
surgeon.

Dr. Strelinger responded to the confirmation of his diagno-
sis by hospitalizing the patient in St. Elizabeth's Hospital,
Elizabeth, New Jersey, on June 8, 1960, two days after re-
ceiving the report. Once there, arrangements were made for
various blood studies and tests, and because the patient was
anemic due to the loss of a substantial amount of blood, a
number of transfusions were ordered. Among the blood
studies made at Dr. Strelinger's order was a prothrombin test.
It is designed to determine whether the coagulation rate of
the blood is within normal limits. The laboratory report on
Mrs. Barenfanger's blood showed a 17 second rate against the
ideal control of 12 seconds. Dr. Strelinger considered this
rate to be within normal limits. It was variously described
by the medical witnesses as within normal limits, at the upper
level of normal, and at a borderline level. As will be seen,
the significance of the prothrombin test is at the heart of the
plaintiffs' case.

The operation was not performed by Dr. Strelinger until June 17. Between the 8th and 17th he undertook to build her up for it. Among other things he had her injected daily intramuscularly with vitamin K which all the medical experts recognized as a blood-clotting aid, and designed to improve the prothrombin rate. When the operation was scheduled for the 17th, the doctor ordered six pints of cross-matched blood for transfusion on that day. In addition, on June 14 or 15, Dr. Albert Minzter, a specialist in internal medicine, was called in consultation. The purpose was to obtain his preoperative evaluation of Mrs. Barenfanger's fitness for operation, and her general condition, particularly with regard to her cardiovascular condition. He examined her, studied the hospital records, the laboratory tests, the X-rays and electrocardiograms (which had been made at Dr. Strelinger's request on June 14), and reported that in his judgment there was no contraindication to surgery. He found no reason for objection to surgical procedure.

We will not undertake to detail the specific care, tests and medicines given between the 8th and 17th. It seems sufficient to say that all the medical experts agreed that the preoperative measures taken by Dr. Strelinger represented standard and accepted medical practice. The only exception to standard procedure claimed by plaintiff had to do with the prothrombin test which, as will appear hereafter, did not have sufficient legal substance to warrant submission of the issue of malpractice to the jury for determination.

On June 17 Dr. Strelinger performed the subtotal gastrectomy in which about 60% of the stomach was excised. The incision revealed a fibrous mass of four by five centimeters. It was much larger than the lesion indicated in the X-rays but turned out to be noncancerous. Moreover, the region was distorted due to long-standing inflammation. According to the records, about 700 cc. of blood were lost during the operation and 500 cc. were replaced by transfusion in the operating room. A drain was inserted and the wound was closed. At the conclusion of the operative procedure, Dr. Strelinger said

the patient's general condition was satisfactory when she was taken to the recovery room; the nurse's written note was "Immediate post-operative condition, good." He departed from the hospital between 1:00 and 1:30 P. M. after leaving instructions for a further blood transfusion and other post-operative care.

Around 4:00 P. M. the doctor was advised the patient was draining blood and he returned immediately to the hospital. He found she was having substantial internal bleeding and made immediate arrangements to return her to the operating room to reopen the incision. An additional transfusion was instituted and continued in the operating room. Then with the assistance of an anesthesiologist, two surgeons, Dr. Sun Chung and Dr. Schoss, and an intern, he undertook the second operation. The original incision was reopened and consider-able blood found in the abdomen. The blood was removed and an examination made to locate bleeding points. No bleeding vessel or broken tie or definite bleeding point was found—only some minimal oozing in the region of the duodenal stump, the pancreas and the gastrolineal ligament. Sutures were in-serted at these places. Two drains were left in the abdomen, one draining the duodenal stump region and the second under the liver. The incision was sutured and the immediate post-operative condition was described as satisfactory.

During this second operation the liver suffered a slight tear, about ½ inch to ⅝ inch long. It was sutured. Plaintiffs claimed at the trial that the tear resulted from lack of due care. The Appellate Division found no actionable negligence in that connection. We agree and see no need for further discussion of the matter, except to note that such issue should not have been submitted to the jury. There was no objection to the charge on that score, however; nor was there a motion or a request that the issue be excluded from the case or jury consideration as a basis for a finding of malpractice.

After the second operation approved medications were ad-ministered in an attempt to control any further bleeding. In addition, the patient was given another transfusion. A con-

dition of shock had developed, attended by decrease in the blood pressure and increase in temperature. Measures were taken to raise the pressure and penicillin was given to counteract the temperature.

At about 8:00 A. M. on June 18, the day after the second operation, defendant called Dr. Louis S. Wegryn for consultation and examination. Dr. Wegryn is a specialist in surgery and Dr. Strelinger's purpose in consulting him was to obtain advice as to whether further operative intervention might be utilized. Dr. Wegryn found some continued bleeding although it was not profuse. At his suggestion primarin was given to aid in subduing the bleeding. He recommended a transfusion of fresh blood and gave the opinion that no further surgery was indicated. Before any additional transfusion was given, Dr. Strelinger asked Dr. Stanley Pomerantz, a specialist in internal medicine and hematology, to see Mrs. Barenfanger. The examination took place around noon on June 18. Dr. Pomerantz studied the hospital records and examined the patient. He noted there was no preoperative history of bleeding tendency, and he found no bruise marks or signs of petechial hemorrhages on her body, particularly at points of puncture for the transfusions and other intravenous and muscular injections, indicating blood-clotting deficiency. He observed a continuance of bleeding at the operative site but a bleeding time test ordered by him was within the upper limit of the normal range. He testified, also, that a prothrombin test apparently made earlier in the day showed a 25 second rate with a control of 12 seconds. That rate was abnormal. He recommended the patient be given whole, fresh blood from siliconized equipment, as well as other medication to correct the bleeding condition, and the effect observed. His suggestions were followed by Dr. Strelinger.

According to Dr. Strelinger, the bleeding came under control before the whole blood from the siliconized containers was transfused on the morning of June 19. Moreover, the blood pressure and elevated temperature had responded to the medication. Unfortunately, a lessening of urinary output had

appeared also and measures were being taken to overcome a possible kidney shutdown.

On June 21 Dr. Lionel Ehrenworth, a specialist in renal disease, saw the patient at Dr. Strelinger's request. He said study of the hospital chart indicated the patient's kidneys were not performing their normal function and that there had been a steadily decreasing urinary output. He concluded she was in renal failure, and probably would not get better by herself. He recommended that she be transferred to Bellevue Hospital in New York City where an artificial kidney mechanism was available for treatment.

Dr. Ehrenworth testified that up to the time of his examination, Mrs. Barenfanger had been given treatment for the kidney condition which accorded with standard medical practice. He said use of an artificial kidney is a trying experience for a patient and the doctor does not "rush" to put him on it. Conservative treatment is given first in an effort to restore the kidney function. This was what Dr. Strelinger had done, and at the time of Dr. Ehrenworth's examination, nothing further could be done except to employ the artificial kidney. His view of the adequacy of Dr. Strelinger's handling of the kidney problem was supported fully by the testimony of Dr. Eugene V. Parsonnet, a surgical specialist who appeared as an expert witness for the defense.

Dr. Ehrenworth's advice was followed and Mrs. Barenfanger was removed to Bellevue Hospital on June 21. There is indication that her kidney condition improved somewhat because the physicians who took over the treatment there did not employ the artificial kidney until three days after her admission. According to Dr. Strelinger, it was used only after all other measures had failed to restore proper kidney action. In spite of the artificial kidney, Mrs. Barenfanger died on July 3, 1960. An autopsy was performed as the result of which the cause of death was given as: suppurative peritonitis, infarction of liver following laparotomy and resection of bleeding gastric ulcer, acute nephrosis and uremia.

Alleged delay on Dr. Strelinger's part in obtaining aid of the artificial kidney in the treatment of decedent's renal condition was made an additional ground for the charge of malpractice. The Appellate Division found no evidence in the record sufficient to warrant submission of that issue to the jury. We agree with its determination, and feel that on proper motion the question should have been excluded from jury consideration.

The Appellate Division felt, however, that plaintiffs' proof having to do with Dr. Strelinger's failure to have a second prothrombin test made before the first operation called for a jury decision as to whether such failure constituted actionable negligence.

Plaintiffs produced Dr. David J. Graubard, a licensed and practicing physician of the State of New York, as an expert witness in support of their case. Dr. Graubard qualified as a general and traumatic surgeon. He had neither seen nor examined Mrs. Barenfanger in her lifetime. His knowledge of the case was acquired at plaintiffs' attorney's request by an examination of photostatic copies of the hospital records, the autopsy report and the death certificate. His primary testimony was given in answer to a series of hypothetical questions put to him at the trial. Since the liver and kidney aspects of the claim have been eliminated, we shall not deal with this witness' statements on those subjects. It is necessary to consider only the legal significance of his testimony respecting Dr. Strelinger's omission to have a second prothrombin test made after the test of June 8 and before the operation was performed on June 17.

Plaintiffs claim Dr. Graubard said, in answering a hypothetical question, that the prothrombin test made at the hospital on June 9 at Dr. Strelinger's request showed an abnormal or deficient blood coagulation rate. We say "plaintiffs claim" because, as shall be demonstrated, in our view the doctor (1) conceded he would rely upon the opinion of a hematologist for such a conclusion, and (2) apparently assumed

from the form of the hypothetical question that the prothrombin test in fact revealed a deficient coagulation rate.

Dr. Graubard acknowledged that all of the preoperative procedures and treatment engaged in by Dr. Strelinger between June 8, when Mrs. Barenfanger was admitted to St. Elizabeth's Hospital, and June 17, the date of operation, were in accordance with accepted medical standards except for his failure to have a second prothrombin test made. He said (on the basis of his assumption) the first such test having revealed a deficient blood-clotting rate, another test should have been made before the operation, and if the rate was still abnormal, the operation should have been delayed until the deficiency was corrected. More specifically, the doctor was asked to assume Mrs. Barenfanger

"\* \* \* was admitted to the hospital on June 8, 1960, primarily for the purpose of being operated upon for an ulcer of the stomach, but because her general condition was poor—as of June 9, 1960, her prothrombin time was 17 seconds with a control of 12 seconds—it was necessary that certain measures be taken to improve her general condition. \* \* \*"

Then he was asked to assume further that the steps taken to improve her condition were primarily the transfusion of four pints of blood and secondarily vitamin prescriptions, that on June 12 Dr. Strelinger found her general condition to be improved and that a "blood count" showed improvement but that no prothrombin test was done before the operation on June 17. On the basis of those various assumptions, he was asked to express an opinion as to whether "there is a proper recognized medical procedure to be followed pre-operatively in such circumstances." And he answered:

"The normal standard for handling a patient with a presumptive diagnosis of a defect to the stomach who has been bleeding, and who has an increased clotting time, that particular condition has to be checked prior to operation to determine absolutely why she should bleed excessively, because the bleeding excessively might be due to something inherent within herself, or as the result of the blood transfusions that she received."

The substance of the hypothetical question was repeated and Dr. Graubard said:

"That in the face of what we call a blood dyscrasia or not normal blood due to the increased bleeding time, she should have been tested prior to the operation, or it should have been investigated from the time it was first known on June 9 up until the time of the operation because if she was going to bleed, then she was not prepared for the operation."

Next he was asked whether a coagulation defect, if noted prior to surgery, should be corrected before the operation was commenced, and he answered affirmatively. Finally, he gave the opinion that "if a known uncorrected coagulation defect exists," an operation should not be performed unless the condition cannot be corrected and an emergency exists.

The trial court and the Appellate Division felt the doctor's testimony provided evidence that the prothrombin test showed an abnormal blood-clotting rate which should have indicated to Dr. Strelinger that if he operated without returning the rate to normal by treatment, the patient might bleed excessively and endanger her life when the surgery was performed. And they felt that such evidence created an issue for the jury as to whether the failure to have a second prothrombin test before the surgery to determine if the coagulation was within the normal range, constituted negligence since the patient did hemorrhage after the operation to the extent described by the physicians. But the record does not provide support of sufficient probative value to bring such a factual issue into being.

Dr. Graubard conceded that hematology is a specialized field of medicine and that knowledge of the normal coagulation rate is within the ken of the hematologist. On being asked for the normal prothrombin rate, he said he depended on the pathologist to give him the answer. And he said that if Mrs. Barenfanger's coagulation rate were normal, his answer that Dr. Strelinger had departed from accepted medical standards in failing to obtain a second prothrombin test would be different.

In our judgment analysis of Dr. Graubard's entire testimony, including the ambiguous hypothetical question referred to above, makes the conclusion inescapable that he assumed the prothrombin rate specified in the question was abnormal. Note, again, the language, especially the interpolation and its location in the question, that Mrs. Barenfanger was admitted to the hospital "for the purpose of being operated upon for an ulcer of the stomach, but because her general condition was poor—as of June 9, 1960 her prothrombin time was 17 seconds with a control of 12 seconds—it was necessary that certain measures be taken to improve her general condition. * * *" The obvious implication of the interpolation was that the doctor was to assume the blood-clotting rate was abnormal. Thereafter, the questions proceeded on the basis of that assumption: "if a coagulation defect was noted prior to surgery * * *"; "if a known uncorrected coagulation defect exists * * *," etc. Thus, it is vital on our review of the case to determine whether any competent proof was introduced at the trial that the prothrombin test made for Dr. Strelinger revealed a deficient or abnormal blood-clotting rate.

Dr. Strelinger testified that a prothrombin rate of 17 seconds with a control of 12 seconds was not significant; the rate was at the upper level of normal. Dr. Albert Minzter, the internist who studied the hospital chart and examined the patient two or three days before the operation, found no contraindication to major surgery. Dr. Stanley Pomerantz, a plaintiff's witness whose specialty is internal medicine and hematology, said the 17 second–12 second rate was a borderline level and could be within normal limits. Dr. John M. Beal, a surgeon and associate professor of clinical surgery at Cornell University Medical College, asserted the rate was within the upper limits of normal and not very exciting. Although Dr. Beal had not examined Mrs. Barenfanger, he had studied the hospital records before testifying. In answer to a hypothetical question which incorporated the facts appearing therein, including the diagnosis, the preoperative treatment and prothrombin test, he said accepted medical

procedure was followed by Dr. Strelinger in operating on June 17, and further that he did not believe another prothrombin test was necessary before surgery. Dr. Louis S. Wegryn, the consultant in general surgery, whose testimony has already been referred to, said that the facts relating to the blood studies and the prothrombin test showed "absolutely no contraindication" to the surgery on June 17. He said also there was no need for a second prothrombin time study. "Actually there is no need of a prothrombin study. * * * Most surgeons don't ask for prothrombin time." In a number of gastrectomies he had done over a period of years he had never asked for such a test.

Dr. Eugene V. Parsonnet, a specialist in surgery, had performed over 600 subtotal gastrectomies. He had studied Mrs. Barenfanger's hospital record before appearing as a witness. In answer to a hypothetical question based on the records, and outlining the treatment given and the prothrombin test ordered by Dr. Strelinger before the first operation, he said the handling of the patient was in accord with standard and accepted medical practice. More specifically, he gave the opinion on the known facts that with a blood coagulation rate of 17 seconds with a control of 12 seconds, there is nothing in accepted medical practice which indicates a need for a second prothrombin test before the operation. Dr. Murray Nussbaum, a specialist in hematology and assistant professor of medicine and acting director of the Division of Hematology at Seton Hall College of Medicine, also testified for the defense. He said in preparation for a subtotal gastrectomy where X-rays showed blood in the stools, the usual medical practice for the surgeon would be to order a blood study as Dr. Strelinger had done. Such a study would include a hemoglobin, hemocrit or red blood count, a white blood count and differential of the peripheral blood smear. After examining the laboratory reports appearing in the hospital records, he said the tests showed normal conditions of the blood, and absence of blood in the urine. He asserted also that the information revealed was contrary to the principles of a coagu-

lation or a bleeding disorder, and opposed to the possibility of a bleeding tendency.

The prothrombin rate of 17 seconds with a control of 12 seconds, Dr. Nussbaum said, was not significant of a bleeding tendency; it was within the normal and accepted range. Unless the rate went above 20 seconds, it would not be considered responsible for bleeding. On the facts presented, in his opinion it was not necessary to do another prothrombin test before operating on June 17.

The alleged duty to recheck the prothrombin rate before the operation was predicated on the factual thesis that the first test showed an abnormality. Existence of such proof was the base on which the claim of malpractice rested. We are satisfied from the record before us that plaintiffs' medical proof was insufficient to raise a factual issue as to whether decedent's blood-coagulation rate was deficient or abnormal prior to the first operation. Under the circumstances it was error to allow the jury to determine whether Dr. Strelinger departed from standard medical practice in failing to have the second test made.

The law recognizes that medicine is not an exact science. Consequently it does not make the physician a guarantor of the cure of his patient. When he takes a case it imposes upon him the duty to exercise in the treatment of his patient the degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in his field. Failure to have and to use such skill and care toward the patient as a result of which injury or damage results constitutes negligence.

The fact that a good result may occur with poor treatment, and that good treatment will not necessarily prevent a poor result must be recognized. So, if the doctor has brought the requisite degree of care and skill to his patient, he is not liable simply because of failure to cure or for bad results that may follow. Nor in such case is he liable for an honest mistake in diagnosis or in judgment as to the course

of treatment taken. A physician must be allowed a wide range in the reasonable exercise of judgment. He is not guilty of malpractice so long as he employs such judgment, and that judgment does not represent a departure from the requirements of accepted medical practice, or does not result in failure to do something accepted medical practice obligates him to do, or in the doing of something he should not do measured by the standard above stated. *Carbone v. Warburton,* 11 *N. J.* 418, 424 (1953) ; *Clark v. Wichman,* 72 *N. J. Super.* 486 (*App. Div.* 1962) ; *Stottlemire v. Cawood,* 213 *F. Supp.* 897 (*D. D. C.* 1963). With rare exceptions (and this case is not one of them), evidence of a deviation from accepted medical standards must be provided by competent and qualified physicians. Ordinarily a jury of laymen cannot be allowed to speculate as to whether the procedure followed by a treating physician conformed to the required professional standards. Since there was no competent proof in this instance that the exercise of normal medical care required Dr. Strelinger to have another prothrombin test, application of the above principles called for withholding the question from jury consideration.

 There is another factor in the case which stands in the way of plaintiffs' recovery. As has been indicated, when the ulcerous lesion in the stomach was discovered, all of the doctors who testified recognized the possibility of malignancy. The X-rays, the internal bleeding, loss of weight and appetite were significant in that regard. One expert suggested the possibility of malignancy was 25%. All the witnesses agreed the only method of determining whether the condition was benign or malignant was to operate. Moreover, the uncontradicted proof was that the ulcer could not have been treated medically; surgery was necessary. Defendant's proof indicated immediate surgery was necessary because of the internal bleeding; the need was described as "emergent," meaning operation should take place within "a week or 10 days something like that; two weeks." (The operation was performed two weeks after Dr. Gelber's consultative examination and eight

days after Mrs. Barenfanger's admission to the hospital.) Apparently the reason for haste was to overcome the possibility of metastasis, or further metastasis, if the condition was malignant. Metastasis is the process by which cancer cells are carried to other parts of the body through the bloodstream.

On the assumption the prothrombin test of June 9 revealed an abnormal blood coagulation rate, and even though the proof shows the treatment and medication administered for eight days before the operation would have remedied the defect, if it existed and was of the kind that would respond to treatment, Dr. Graubard said surgery should not have been engaged in until a second test was made. He said further if such test when made did not show a normal rate, the surgery should be delayed until the condition was corrected. He placed no limit on the delay, nor did he say what should be done if the rate could not be remedied by treatment. But on being asked if the possibility of metastasis did not require speed in operating, he said that was "one of those problems that are still being fought in the halls of medical schools and lectures * * *." The answer must be taken to mean that the speed with which the operation is performed under such circumstances is a matter about which there are differing schools of medical opinion. In such situation the plain inference is that the matter must be left to the good faith judgment of the experienced attending surgeon. It follows, therefore, that when a surgeon selects one of two courses, *i. e.,* immediate operation in the sense Dr. Gelber described, or delay of an indefinite character, either one of which has substantial support as proper practice by the medical profession, a claim of malpractice cannot be predicated solely on the course pursued. See *Snyder v. St. Louis Southwestern Ry. Co.,* 228 *Mo. App.* 626, 72 *S. W. 2d* 504 (*Ct. App.* 1934); *McPeak v. Vanderbilt University Hospital,* 33 *Tenn. App.* 76, 229 *S. W. 2d* 150 (*Ct. App.* 1950). For this additional reason, Dr. Graubard's testimony will not support the finding of negligence against the defendant.

## II.

Some other aspects of the trial presented as grounds of appeal require comment.

■ When the prospective jury was in the box, plaintiffs' counsel asked if any juror ever suffered from, or now suffers from, an ulcer. One juror answered in the affirmative and on further questioning revealed he had been operated on for the condition. Then he was asked whether the two doctors he mentioned as the diagnosing and operating physicians had told him "it is possible you may not survive the operation?" Defendant's objection was sustained but the trial court ignored the request to instruct the jury to disregard the question, and denied the motion for a mistrial. Obviously the question was improper. If the juror said he had been advised he might not survive the operation, and it developed that Dr. Strelinger had not given his patient the same advice, the jury might feel he had been remiss in not doing so. Or, if the prospective juror had not been told of that danger, they might believe it was because the operation was considered a comparatively simple one from which operating surgeons did not think of death except perhaps as a very remote possibility. Either way the question was answered, the capacity for prejudice was present.

During the course of the trial plaintiffs' cross-examination of Dr. Wegryn developed that Dr. Strelinger was not a member of the staff of the Alexian Brothers Hospital in Elizabeth. Then the doctor was asked if defendant had been such a member about a year ago, and he indicated that Dr. Strelinger had resigned from the staff some time ago. Thereafter, over objection, plaintiffs' attorney undertook by further questioning to insinuate that there was something unusual about the resignation, even though Dr. Wegryn testified he was not around when the resignation took place. Although the objection was finally sustained, undoubtedly an aura of prejudicial speculation remained in the minds of the jury. We agree that on the record presented the questioning was improper.

Moreover, plaintiffs' counsel persisted, even after the court had admonished him, in insinuating in his questioning that there was something wrong in the pretrial conferences between defense representatives and the medical witnesses. And, more particularly, he made repeated references to a Mr. Condon, who was described as sitting near defense counsel. Condon does not appear in the record as an attorney nor was his specific connection with the defense revealed. The improper purpose seems obvious and should not have been engaged in.

In a close case on liability the cumulative effect of this type of improper questioning cannot be ignored. *State v. Orecchio,* 16 *N. J.* 125 (1954). Since plaintiffs' judgment is being reversed for reasons already stated, we need not decide whether the errors ought to be considered in themselves a decisive factor on the appeal.

### III.

Deficiencies in the complaint, pretrial conference order and judgment require mention.

There are two plaintiffs in the case, Heinrich Schueler as executor of the estate of Julia Barenfanger, deceased, and Otto Schueler, individually. The complaint is in one count. It recites that decedent left surviving her father, Otto Schueler, and her brother, Heinrich Schueler, who was named executor in her will and was joined as plaintiff in his representative capacity. It alleges also that Otto Schueler had suffered pecuniary loss by reason of his daughter's death "in that she undertook to support him in her lifetime."

After charging defendant's negligence, the complaint alleges that Julia Barenfanger was caused pain and suffering thereby until she died on July 3 1960. It then says the negligence caused the estate to become indebted for the payment of medical and hospital bills and funeral expenses. And, in the last paragraph, Heinrich Schueler, as executor, and Otto Schueler demand judgment against defendant "for damages

in an amount to be determined by a court and jury and as provided by the provisions of *N. J. S.* 2A:31–1 *et seq.*, " the Death Act.

██ The tenor of the complaint with respect to the plaintiff Otto Schueler seems to be that he sues as an individual claiming pecuniary loss as the result of his daughter's death. Obviously he has no individual right of action under the Death Act. The cause of action for those suffering pecuniary loss must be brought by an administrator *ad prosequendum* in case of intestacy, or by the executor where (as here) the decedent left a will. *N. J. S.* 2A:31–2. No objection was made to the deficient complaint in the answer or by pretrial motion. Nor was Otto Schueler stricken as a party plaintiff at the pretrial conference.

Although we find no formal elimination of Otto Schueler as a party plaintiff, the trial court sensed the difficulty for, in his charge, he told the jury the executor sued for the pecuniary loss as well as for the pain, suffering and expenses incurred by Julia Barenfanger before her death. And he instructed them to return separate dollar verdicts for the "plaintiff" on each claim.

After deliberation the jurors returned with verdicts which reflected confusion on their part. They seemed to feel three verdicts should be returned, for the father, for the estate and for pain and suffering. The court told them there were only two claims, one for the death and one for injuries, pain and suffering, with the executor suing on both. Even after this advice, one of the jurors said, "Your Honor, how about the father? Isn't there any claim?" After further explanation, the jurors retired again and returned a verdict of "$8,000 for the estate," and $2,000 for the pain and suffering. The court then put the verdicts in terms of $8,000 "in behalf of the plaintiff for the death of the deceased," and $2,000 "in behalf of the plaintiff" for the personal injuries, pain and suffering. And a poll of the jury thereon indicated unanimous approval. The judgment as entered on the verdicts, instead of remaining consistent with the trial court's remedial efforts, recites that

the trial "resulted in a verdict in favor of the *plaintiffs* and against the defendant. Whereupon it is on this 8th day of May, 1962 ordered and adjudged that the *plaintiffs* recover of the defendant $8,000 for damages and death and $2,000 for pain, disability, injuries and suffering and costs of $79.99." (The emphasis is ours.) Who the plaintiffs are or how their names are noted on the judgment docket does not appear. In the present state of our civil practice technical difficulties of the type described are easily avoided.

## IV.

The judgment is reversed.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.

*For affirmance*—None.