243 N.J. Super. 218 (1990)
579 A.2d 309
ESTHER LANZET, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATES OF ANNA LANZET AND MAX LANZET, DECEASED, PLAINTIFF-RESPONDENT, CROSS-APPELLANT,
v.
LAWRENCE M. GREENBERG, M.D., SAVEREN SCANNAPIEGO, M.D., TALLAT BEKHIT, M.D., AND ROSE L. OEN, M.D., DEFENDANTS-APPELLANTS, CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 12, 1989.
Decided January 19, 1990.
*220 Before Judges ANTELL, ASHBEY and ARNOLD M. STEIN.
Timothy J. Langan argued the cause for appellant-cross-respondent Dr. Oen (Francis & Berry, attorneys; Timothy J. Langan, on the brief).
Robert D. Kretzer argued the cause for appellant-cross-respondent Dr. Bekhit (Lamb, Hartung, Coughlin, Kretzer & Reinman, attorneys; Robert D. Kretzer, on the brief).
*221 Neil Reiseman argued the cause for appellant-cross-respondent Dr. Scannapiego (Reiseman, Mattia & Sharp, attorneys; Deirdre M. Dennis and Neil Reiseman, on the brief).
Bradley M. Wilson argued the cause for appellant-cross-respondent Dr. Greenberg (Feuerstein, Sachs, Maitlin & Fleming, attorneys; Bradley M. Wilson, on the brief).
Francis X. Dorrity argued the cause for respondent-cross-appellant Esther Lanzet.
The opinion of the court was delivered by ANTELL, P.J.A.D.
This medical malpractice case arises from the incapacitation and eventual death on September 7, 1984, of Anna Lanzet following cataract extraction and intraocular lens implantation surgery on August 29, 1983. A jury trial was held between February 6, 1986, and March 7, 1986, resulting in a verdict of liability against all four defendant physicians and awarding to the Estate of Anna Lanzet $208,232, her stipulated medical special damages, and to the estate of her husband, Max Lanzet, who died on July 4, 1984, $500,000 per quod.
Plaintiff moved for a new trial as to damages and the defendants cross-moved for judgment n.o.v. or, in the alternative, a new trial or a remittitur with respect to the per quod damages awarded Max Lanzet's estate.
By order of June 20, 1986, the trial court vacated the per quod award to Max Lanzet's estate and ordered a new trial. It also ordered a new trial on damages to Anna Lanzet's estate, limited to the claim of "disability and impairment," concluding that it had erred in refusing to charge that aspect of the claim to the jury. It denied plaintiff's application to have the question of Anna's pain and suffering, for which the jury had awarded nothing, also reconsidered at the new trial. The court denied defendants' cross-motions in all respects.
*222 Following interlocutory review on plaintiff's application, in which we affirmed the order of June 20, 1986, with respect to plaintiff's appeal and in which we dismissed defendant's cross-appeal, Lanzet v. Greenberg, 222 N.J. Super. 540, 537 A.2d 742 (App.Div. 1988), the issue of damages was retried in September 1988. That trial resulted in a verdict of $1,300,000 to the Estate of Anna Lanzet for disability and impairment from August 29, 1983, to September 7, 1984, and an award of $260,000 per quod to the Estate of Max Lanzet. The Estate of Anna Lanzet was also allowed prejudgment interest from April 2, 1984, to September 16, 1988, in the amount of $768,803. 35% of the liability was allocated to Greenberg, 35% to Bekhit, 20% to Oen and 10% to Scannapiego. Defendants now appeal from the liability and damage aspects of the judgment.
Anna Lanzet was admitted on August 28, 1983, to Greenville Hospital in Jersey City for surgery the following day. Dr. Oen, an internist, examined her on the day of her admission and prescribed Hydro-DIURIL, a diuretic, to lower her blood pressure. Mrs. Lanzet, who was 65 years old, had been treated for high blood pressure for the previous two years. Dr. Oen then cleared the patient for surgery the following morning and recommended a local anesthesia.
On the morning of surgery Dr. Oen was notified that Mrs. Lanzet's blood pressure was again elevated to a reading of 170/100. By telephone, Dr. Oen then prescribed an administration of Lasix, another diuretic. The medication was given and the patient's blood pressure returned to 140/94. She was then again cleared for surgery by Dr. Oen.
Dr. Bekhit, the anesthesiologist, also examined Mrs. Lanzet on the evening of August 28 and again on the morning of surgery. He knew that a drug had been administered to lower the patient's elevated blood pressure, and he concluded from his examination that surgery was not contraindicated. Before the operation, Dr. Bekhit discussed the case with Dr. Greenberg, who, assisted by Dr. Scannapiego, was to perform the cataract *223 surgery. Since it was to be done under a local anesthetic, Dr. Bekhit's role was essentially to monitor the patient and to respond to emergencies involving her vital signs.
Surgery began at approximately 11:15 a.m. after the patient had been given 1 cc of Innovar (a very small dose), a sedative which plaintiff's expert acknowledged to be a "perfectly appropriate medication to give preoperatively." At 11:20 a.m. it was noted that the patient's pulse had dropped to 45 from a reading of 65 at 11:10 a.m. Dr. Bekhit responded by administering intravenously.4 milligrams of Atropine and after one or two minutes the rate returned to 60, an acceptable level for surgery. Between 11:32 and 11:35 a.m. the pulse rate resumed its decline and fell below 40. Thereupon another .2 milligram dose of Atropine was administered and a third administration was given between 11:36 and 11:37 a.m. At 11:40 a.m., when the rate dropped to 20 and the patient became cyanotic, a code was called and the operating team applied themselves exclusively to resuscitative measures. By this time, however, the curtailed blood flow to the brain and the resulting oxygen starvation resulted in a global cerebral hypoxia which left Mrs. Lanzet in a chronic persistent vegetative state until her death some 13 months later.
In bringing this action, plaintiff alleges that each of the defendant doctors contributed by their negligence to the decedent's injury. As to Dr. Oen, the negligence is said to lie in her clearing the decedent for surgery on August 29 without further investigating the cause of her elevated blood pressure on the morning of the surgery. As to Dr. Bekhit, plaintiff maintains that he failed to apply timely and appropriate resuscitative measures in response to the drop in Mrs. Lanzet's pulse rate. As to Drs. Greenberg and Scannapiego, it is alleged that had they been paying attention to the "general well being" of the patient, they would have aborted the operation and would have begun resuscitative measures in sufficient time to avert the global hypoxia.
*224 The pertinent legal principles are settled. Unlike the ordinary negligence case, it is necessary in a medical malpractice action to prove the applicable standard of care by expert testimony since it would otherwise lie beyond the competence of a technically unschooled jury. Where such expert testimony is not provided, "it is proper for the court to grant a dismissal at the close of plaintiff's case." Sanzari v. Rosenfeld, 34 N.J. 128, 135, 167 A.2d 625 (1961).
The basic rule is that a doctor must exercise in the treatment of his patient
the degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in his field. Failure to have and to use such skill and care toward the patient as a result of which injury or damage results constitutes negligence. [Schueler v. Strelinger, 43 N.J. 330, 344, 204 A.2d 577 (1964)].
Not only must the plaintiff show a departure by defendant from the standard, she must also show "a fact equally essential to recovery of damages, i.e., that the deviation was the reasonably probable cause of the injurious condition arising thereafter." Germann v. Matriss, 55 N.J. 193, 208, 260 A.2d 825 (1970). The governing principles were woven together in the following language of Schueler v. Strelinger, 43 N.J. at 344-345, 204 A.2d 577:
The fact that a good result may occur with poor treatment, and that good treatment will not necessarily prevent a poor result must be recognized. So, if the doctor has brought the requisite degree of care and skill to his patient, he is not liable simply because of failure to cure or for bad results that may follow. Nor in such case is he liable for an honest mistake in diagnosis or in judgment as to the course of treatment taken. A physician must be allowed a wide range in the reasonable exercise of judgment. He is not guilty of malpractice so long as he employs such judgment, and that judgment does not represent a departure from the requirements of accepted medical practice, or does not result in failure to do something accepted medical practice obligates him to do, or in the doing of something he should not do measured by the standard above stated. [cases cited]. With rare exceptions (and this case is not one of them), evidence of a deviation from accepted medical standards must be provided by competent and qualified physicians.
The sole expert witness produced by plaintiff was Dr. David C.C. Stark, a professor of anesthesiology at the Upstate Medical Center, a teaching hospital in Syracuse, New York. He *225 used the term "bradycardia" to describe in medical parlance the decedent's rapid, intense and progressive drop in pulse rate. Although there are variances in his testimony[*] Dr. Stark pointed to evidence in the record which he described as "proof positive" that the bradycardia "was specifically related to a cerebral-vascular accident." This compromised the action of the heart which, in turn, resulted in a substantially decreased flow of blood to the brain and the consequent global hypoxia, i.e., "a lack of oxygen throughout the whole brain as opposed to a situation where a, let's say, a stroke had occurred, then, a little bit of the brain would be damaged."
Dr. Stark explained that because of the early struggle for oxygen when the accident occurred, the brain was less able to tolerate the impact of the cardiac arrest and the interrupted supply of blood. In this way, he said, "Hypoxia was the cause of the bradycardia." Although the witness assigned no responsibility to any of the defendant doctors for the happening of the cerebral-vascular accident, he held them accountable for not following other procedures and courses of action which would have spared Anna Lanzet her experience on the operating table or would have resulted in an earlier resuscitation and consequent avoidance of the global hypoxia.

DR. OEN
Dr. Oen's negligence, according to Dr. Stark, lay in her failure to make a bedside reassessment of the patient after she *226 learned of the patient's elevated blood pressure before clearing her for surgery. When asked if he had an opinion whether or not Dr. Oen "deviated from medically acceptable standards in not reassessing Anna Lanzet for surgery on the morning of October 29, 1983," he answered:
Yes, that is my opinion. I think that if  as I said before, having with regard to the fact that on the morning of surgery it is necessary to have additional medical consultation and to prescribe important diuretics over the telephone, I think is a basis on which bedside assessment and reassessment would very well have resulted in a happier outcome.
The answer given is simply a "net opinion" or a statement of the doctor's own personal opinion as to what good medical practice dictated under the circumstances without any attempt to demonstrate how the lack of a bedside reassessment was a factor causative to the patient's injury and death. The statement that a reassessment would have produced a "happier outcome" does not satisfy the need for an explanation in concrete terms of what a bedside reassessment would have accomplished or what findings would reasonably have been made that could be related to what later happened on the operating table. Indeed, we come back to Dr. Stark's testimony that what befell Mrs. Lanzet was probably caused by a cerebral-vascular accident, something which was neither shown to be foreseeable nor related in any way to the surgical procedure in progress. Absent from the record is any statement of the physiological mechanics which intervened between Dr. Oen's telephoned prescription for Lasix on the morning of the surgery and the disastrous events on the operating table.
In Parker v. Goldstein, 78 N.J. Super. 472, 189 A.2d 441 (App.Div. 1972), certif. den. 40 N.J. 225, 191 A.2d 63 (1963), an obstetrician was held answerable by a jury for the death of a patient which was caused by a pulmonary embolism during childbirth. The theory of recovery was that the doctor's delay in performing a Caesarean section bore a causal relationship to the embolism. The Appellate Division reversed because proof of causal relationship was absent. The court there stated:

*227 There was no word of testimony from the [expert] witness to explain the physiological reactions of the decedent to the alleged delay, or of the anatomical effect of the delay on the pulmonary structure of decedent. The opinion, thus, was what is commonly described as a "net opinion." [Id. 78 N.J. Super. at 483, 189 A.2d 441].
It therefore concluded that the
"complete absence of explanation ... of how, and in what manner, the supposed delay caused or contributed to the pulmonary embolism left an irreparable void in plaintiff's proof. Acceptable medical opinion of causation supported by expert explanation was an integral and indispensable part of plaintiff's case. [Id. at 484, 189 A.2d 441].
The fault attributed to Dr. Oen by Dr. Stark was that she cleared the decedent for surgery. As we have noted, the surgery was not responsible for the cerebral-vascular accident which later occurred. Therefore, the only effect of cancelling the surgery would have been that Mrs. Lanzet would have suffered the accident at a place other than in the operating room. Her pulse was dropping rapidly, she was showing cyanosis, her brain had become globally hypoxic and without the resuscitative efforts which were made at 11:40 a.m., she would probably have been denied the 13 months of vegetative existence following the operation.
A recurring theme in Dr. Stark's testimony was that the preoperative measures taken with Mrs. Lanzet constituted a "crash preparation" for surgery. The characterization is based on nothing more than the fact that when her elevated blood pressure was discovered she was moved from first to third place in the doctors' schedule of operations that morning to allow time for the Lasix to reduce her blood pressure. Furthermore, the doctor acknowledged on cross-examination that the decedent's blood pressure was not really "terribly elevated" and that "more than likely," she probably didn't even need treatment for the elevated blood pressure. The claim that the patient was the subject of "crash preparation" for surgery is therefore without foundation in the evidence.
We conclude that the finding of professional negligence on the part of Dr. Oen which was causally related to the decedent's injury is not supported by the evidence.

*228 DR. BEKHIT
Dr. Stark testified that Dr. Bekhit's treatment of the bradycardia was "appropriate" until after the second administration of Atropine at 11:36 a.m. At that point, he says, Dr. Bekhit should have investigated the cause of the bradycardia, made a "more active assessment" of the plaintiff's condition and considered using another medication to stimulate the heart.
The function of Atropine is to block the vagus nerve. When stimulated, the vagus nerve, which lies directly behind the eye, will have the effect of slowing the heartbeat. As Dr. Stark said, Atropine is a commonly used drug that increases the pulse rate in most cases. Apparently, the Atropine had its desired effect with the first administration at 11:20 a.m. However, after the administration at 11:36 a.m. failed to achieve a response Dr. Stark says Dr. Bekhit should have considered that there was "... something adrift further down in the pumping mechanism." The "treatments of choice" open to Dr. Bekhit were either to continue with the Atropine or switch to another drug, such as Ephedrine or Isuprel, which directly stimulate the heart muscle. If the drug had been changed, according to Dr. Stark, the cardiac arrest would have been brought under control and the global hypoxia averted.
Dr. Stark said that Dr. Bekhit should have recognized as a warning sign the fact that the first Atropine administration at 11:20 a.m. elicited only a "modest" response by bringing the pulse up to just below 60. He stated that in most cases the pulse rate after such a dose would have increased to 80 or 90. Thus, he stated, the third dose, which was administered between 11:36 and 11:37 a.m., was not "appropriate."
Dr. Stark did not testify that recognized medical standards controlled the decision to continue the administration of Atropine or change to Isuprel or Ephedrine. Although he said that a more "active assessment" should have been made, he did not specify what form this should have taken, what course of action would have resulted from it, and, most important, when in the *229 sequence of events recognized medical standards required the change to Isuprel or Ephedrine. In fact, he acknowledged on cross-examination that there was "no obligatory standard that compelled the use of something besides Atropine," and actually said no more than that the use of another drug was "one of the options." He also acknowledged the possibility that in such situations catastrophe can be caused "unnecessarily by over-intervening too soon." Writing on this subject in his own book on anesthesia, he wrote: "It may be wise merely to watch the situation here carefully. It is all too easy to over treat in these circumstances."
We observe that even on cross-examination Dr. Stark carefully avoided ratifying the phrase "standard of practice" when used by counsel to determine whether or not Dr. Bekhit's course of treatment was negligent. He chose instead to characterize the treatment in terms of whether it was or was not "appropriate."
[M]uch more than the personal opinion of a medical witness is necessary to establish a standard of acceptable medical practice. The expert testimony must relate to generally accepted medical standards, not merely to standards personal to the witness. See Carbone v. Warburton, 11 N.J. 418, 425 [94 A.2d 680] (1953). See also, Schueler v. Strelinger, 43 N.J. 330, 346 [204 A.2d 577] (1964). [Fernandez v. Baruch, 52 N.J. 127, 131, 244 A.2d 109 (1968)].
We conclude that Dr. Stark's testimony falls significantly short of establishing the required standard of medical practice to determine whether Dr. Bekhit exercised due care. Under the circumstances the doctor's choice of treatment involved the exercise of medical judgment only. In Dr. Stark's opinion, the "inappropriate" treatment occurred between 11:36 a.m., when the third administration of Atropine was given, and 11:40 a.m., when resuscitation began. In Dr. Bekhit's judgment the proper treatment of choice was a third administration of Atropine which was given between 11:36 and 11:37 a.m., although when the resuscitative effort began he was preparing to administer Isuprel. Taking into account that a minute or two was required for the Atropine to take effect, to say in retrospect that a different drug, or earlier resuscitative efforts, would have *230 saved the patient does not equate with an expert opinion that Dr. Bekhit's failure to resort to those measures before 11:40 a.m. constituted a deviation from medical standards. We can only interpret Dr. Stark's testimony to mean that the choice of medication, and the decision of when to change from one to another, must be left to the trained judgment of the anesthesiologist responsible for the patient's care and whose allotted time for decision must be measured in fractions of a minute. Although Dr. Stark might have earlier utilized a different treatment, this does not serve as a standard by which to measure Dr. Bekhit's performance and conclude that his judgment was not responsibly exercised. "A physician must be allowed a wide range in the reasonable exercise of judgment." Schueler v. Strelinger, 43 N.J. at 345, 204 A.2d 577. The fact that the patient was not saved does not evidence negligence. Id. at 344, 204 A.2d 577.
We also note Dr. Stark's testimony that Dr. Bekhit breached acceptable medical standards by failing to discuss with the surgeons the patient's changed condition on the morning of the surgery. However, we find no proximate causal relationship between this alleged breach of standards and the injury. Moreover, it appears from the record that Dr. Bekhit did, in fact, confer with Dr. Greenberg and Dr. Scannapiego prior to surgery.

DR. GREENBERG and DR. SCANNAPIEGO
Dr. Stark testified that Drs. Greenberg and Scannapiego "failed to pay sufficient attention to Anna Lanzet's well-being on the argument that they were concentrating on the surgery." Thus, he claimed, they failed to "respond to the audible and tactile stimuli in the operating room which signaled the decline of the patient's vital signs," that "neither appreciated the seriousness of the patient's condition ... and neither requested that the operation be aborted, prior to its conclusion." Also, "they failed to communicate with or respond to operating room personnel concerning the patient's condition and continued according *231 to their surgical plan to conclude three cataract surgeries that morning as scheduled." In combination, Dr. Stark said, "[t]hese actions were inimical to the patient and contributed to the delay of early resuscitative efforts. Each constituted a deviation from medically acceptable standards of operating room surgeons."
Nothing in the evidence supports Dr. Stark's frequently expressed belief in the surgeons' adamant determination to complete three cataract surgeries that morning regardless of the consequences.
Nor do we find anything in the evidence to support Dr. Stark's other conclusions. All that we can discern is that the surgeons were proceeding with their work while Dr. Bekhit was administering to the patient's declining vital signs. Although Dr. Stark says they deviated from acceptable medical standards, he does not say what the standards are and does not explain at what point in the sequence of events they require these defendants to abandon the operation and apply themselves to resuscitating the patient. All we can discern is that after the patient failed to respond to the third dose of Atropine and after her cyanotic condition was noted immediate resuscitative efforts were begun. It is not enough to look back and say, in judging these physicians, that if resuscitative efforts had been earlier made the patient would have survived.
According to Dr. Stark, Dr. Bekhit's "responsibilities lie in maintaining the vital functions of the patient at as near normal as possible." We are not told of any operating room protocol whereby the surgeons may displace the anesthesiologist and determine the requirements of the patient which come under the latter's responsibilities. Nor can we determine from the testimony in what respect Drs. Greenberg and Scannapiego failed to "communicate" with the other operating room personnel and the proximate consequences of such failure to communicate. Since Dr. Bekhit was responsible to monitor the patient's vital signs, Dr. Stark's opinion that the surgeons must answer *232 for the failure to resuscitate sooner draws upon the "captain of the ship" doctrine, which has been expressly rejected in the State of New Jersey. Sesselman v. Muhlenberg Hospital, 124 N.J. Super. 285, 306 A.2d 474 (App.Div. 1973).
As to the main appeal, to the extent that it denies defendants' motion for judgment n.o.v. on the issue of their liability, the order dated June 20, 1986, is reversed. See Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969).
Plaintiff's cross-appeal challenges the trial court's exclusion of evidence as to the extent and nature of the decedent's disability before death. The rulings clearly lay within the discretion of the court and plaintiff's contentions to the contrary are lacking in merit. R. 2:11-3(e)(1)(E).
NOTES
[*] Dr. Stark also testified that we "never will know" what caused the heart rate to drop. However, he made it clear that the laboratory indications in the acute care unit indicated that there was no heart attack. Elsewhere in his testimony he explained that a combination of things, the diuretics which had been administered, the administration of Innovar, and the fact that decedent was in a supine position on the operating table, "can set up a situation where a patient is not able adequately to breathe on her own. This results in hypoxic, deprivation of oxygen situation, and this is characterized very commonly by a sudden drop in pulse rate." He also testified that a stroke was "extremely unlikely."