78 N.J. Super. 472 (1963)
189 A.2d 441
RAY PARKER, ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF EMMA PARKER, DECEASED, PLAINTIFF-RESPONDENT,
v.
SAMUEL L. GOLDSTEIN, ET AL., AND HARRY BOFFMAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 14, 1963.
Decided March 20, 1963.
*473 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Samuel P. Orlando argued the cause for appellant (Messrs. Gaffey & Webb, attorneys; Mr. Aaron Dines, on the brief).
Mr. Seymour B. Jacobs argued the cause for respondent (Messrs. Balk and Jacobs, attorneys).
The opinion of the court was delivered by FOLEY, J.A.D.
This is a medical malpractice action brought under the Death Act, N.J.S. 2A:31-1 et seq. Defendant Boffman appeals from a judgment of $78,000 entered in favor of the plaintiff in the Law Division on a jury verdict.
Plaintiff's complaint also named Dr. Samuel L. Goldstein and Doctors Hospital, Inc., as defendants, charging each with negligence which contributed to the decedent's death. However, motions for judgments of involuntary dismissal *474 made by those defendants at the close of plaintiff's case were granted. The motion in behalf of Doctors Hospital, Inc. was unopposed; plaintiff does not appeal from the judgment entered in favor of Dr. Goldstein.
In submitting the case against Dr. Boffman to the jury, the trial court, for the purpose of clarity, separated plaintiff's cause of action into two separate and distinct claims, and charged:
"If you find that Dr. Boffman failed to exercise the proper standard of care of the medical profession in failing to arrange for a Caesarean operation prior to the delivery date and that such failure was the proximate cause of the decedent's death, then you will find for the plaintiff as to claim number one."
and
"* * * if you find that Dr. Boffman on July 31, 1957 had the decedent's consent and failed to exercise the proper standard of care of the medical profession, that is, in failing to arrange for a Caesarean within a reasonable time, and that such failure was a proximate cause of the decedent's death, then you will find for the plaintiff as to claim number two."
When the verdict was announced, the foreman stated that the vote of the jury was eleven to one in plaintiff's favor as to claim number one, and that the jury was unanimous in its finding of liability on claim number two.
Subsequently, defendant moved for a new trial. In a letter opinion, the trial judge granted defendant's motion as to claim number one, holding that "the evidence leads irresistibly to the conclusion that there was no negligence by Dr. Boffman in this regard. It does not appear to the Court that the minds of reasonable men could differ as to this, * * *." This, in effect, was a finding that plaintiff had failed to sustain the burden of proof as to claim number one, as a matter of law. The court denied the motion as to claim number two, holding that there was "ample evidence from which the jury could find that Dr. Boffman deviated from accepted practice of the medical profession on the evening of July 31, 1957, *475 although there were sharp factual disputes." The court also rejected defendant's argument that the verdict was excessive in amount.
This appeal followed. Plaintiff does not cross-appeal (see R.R. 1:2-6), but suggests that since the defendant's notice of appeal states that appeal is taken "from the whole of the final judgment entered in the above entitled action in favor of plaintiff-respondent," it thereby opened "in the Plaintiff's favor that part referable to claim #1 as an additional ground on which the judgment may be affirmed." Plaintiff cites us no authority in support of this contention, nor is the impropriety of the court's disposition of claim number one on the motion for a new trial set down in plaintiff's brief as a question involved in the present proceeding.
Lastly, plaintiff does not argue in his brief that the trial court erred in holding that the proofs did not raise a jury question of defendant's liability on claim number one. See R.R. 1:7-1 (c).
Consequently, we will concern ourselves only with the adjudication of claim number two, and with the subsidiary points raised by the defendant which relate to such determination.
In December 1956 decedent, then thirty-three years of age, accompanied by her husband, plaintiff herein, consulted Dr. Goldstein with reference to a suspected pregnancy. The doctor had previously delivered her of a child by Caesarean section. His examination disclosed that decedent was pregnant and he told the couple that a Caesarean would again be necessary.
The Parkers consulted Dr. Goldstein twice thereafter. On the second occasion the doctor told them that he "was kind of ill, that he would have to go away for a rest," and then introduced them to Dr. Boffman who took over the case. They saw Dr. Boffman twice after that. During the second of these visits, according to plaintiff, the doctor told him that he would let plaintiff know when he should bring Mrs. Parker back. They did not return to Dr. Boffman's office thereafter, *476 and did not attempt to communicate with him again until July 31, 1957.
Plaintiff testified that during the afternoon of that day his wife awakened him and complained of pain. He said that he then telephoned the defendant and could get no answer. He dressed his two children and again telephoned but received no response. He then took Mrs. Parker and the children to the hospital, arriving at about 6:30 P.M.
Mrs. Parker was admitted as a patient after signing a consent to the performance of any operation or surgical procedure which might be deemed necessary in furtherance of her care and treatment. She was then sent to the labor room and placed in the care of Virginia Puder, a nurse. Mrs. Puder, testifying from her bedside notes which were contained in the hospital chart, said that, when the patient was admitted to the labor room at 6:30 P.M., she stated that she had passed blood clots at home; that some staining was present; that the patient had pain every three to five minutes, thirty seconds in duration; and that an effectual soapsuds enema was administered.
She testified further, that Dr. Boffman visited the patient at 7:30 P.M. and that in her presence the doctor "wanted Mrs. Parker to submit to a Caesarean section. Mrs. Parker wanted a normal delivery and Dr. Boffman was trying to coax her * * * into having the section," but that the patient "was frightened. She didn't want to be operated upon." Neither the hospital chart nor Mrs. Puder's testimony indicate that she was in attendance of the patient thereafter until 11:10 P.M. when she administered 100 mg. of demerol pursuant to the doctor's direction. Mrs. Puder then went off duty and was replaced by nurse Margaret G. Coyle.
Dr. Boffman testified that the last time he had examined Mrs. Parker prior to July 31, 1957 was on June 8 of that year. At that time he found her heart and lungs were pathologically negative, her blood pressure was 130/110, and her weight 310 lbs. He prescribed a reducing diet, told her to return in two weeks for a further checkup, and advised her to *477 go into the hospital a week before the expected date of delivery (August 16) for performance of a Caesarean section. The doctor said also that after June 8 he sent Mrs. Parker a "card" asking her to come in for an examination, and to make arrangements to go to the hospital, but that he received no response to this request.
Turning to the events of July 31, Dr. Boffman testified that after 6:00 P.M. he was informed by telephone that Mrs. Parker was having pains. He told the caller to take Mrs. Parker to Doctors Hospital, and then called Dr. Warren Kauder, a general surgeon with whom he had previously arranged to perform the expected operation. Soon after he went to the hospital, arriving at between 7:00 and 7:30 P.M. He testified:
"When I entered the labor room the only ones that were in the labor room was the patient, Mrs. Parker, and the nurse, Mrs. Puder. When I entered the room I said to Mrs. Parker, `So, you are here. Why did you not answer my card?' She didn't say anything because at that particular time she had another pain.
And I said to her, I said, `Okay, let me do an examination and get you ready for an operation.' She turned over and Mrs. Puder dressed her; that is, put a sheet over her and I examined her rectally. At the time of the examination there was only one finger that could be admitted in the opening of the womb.
I said to Mrs. Parker, I said, `We are going to get ready for your Caesarean operation.' And she said to me, `Doctor, I don't want an operation. I want to have this baby normally.' I said to Mrs. Parker, I said, `You were scheduled for an operation, Mrs. Parker, and if you have your operation now you can alleviate all these pains that you are having.' I said, `You have already consented to an operation.'
She said, `I know, but I don't want an operation. I'm scared, Doctor, please let me try to have this baby normal because I want to have it normal,' at which time I walked out."
He said that he then telephoned Dr. Kauder, and also unsuccessfully attempted to reach Mr. Parker at a telephone number inscribed in the hospital chart. Shortly thereafter, he examined the patient again and urged her to have the operation and she refused. She said she wanted the baby normally and that she was afraid of an operation. He left the hospital *478 between 8:15 and 8:30 P.M., went to his office which was three or four blocks away, and returned at about 10:00 P.M. The following transpired:
"I went in and asked Mrs. Parker, `Are you ready to consent for the operation?' She said, `No, Doctor, let me try to have this baby normally because I want to have it normally. I'm afraid of an operation.' And I said to Mrs. Parker, `You are wasting time, Mrs. Parker. Why don't you consent to the operation.' I didn't want to insist because this was a woman who was excited, scared to death. I didn't want to frighten her any more and at the same time I tried to get her to have this operation because I knew that she needed the operation. Then I made a subsequent rectal examination."
Further physical examination of the patient revealed that no progress toward birth had been made. At about 11:00 P.M., according to the doctor, he again told Mrs. Parker that she must have the operation, pointing out that she had been in the labor room since 7:30 P.M. having labor pains every five or ten minutes without making progress, and that if the Caesarean was deferred the baby would be unable to survive the extended period of labor. Again the patient insisted that she wished "`to still try to have this baby normally'" and that she did not "`want to be cut.'" He again examined her and left the room.
He returned between 11:15 P.M. and 11:45 P.M., told Mrs. Parker that she was wearing herself out, and would not be in any condition to have the operation. When she asked, "`Why can't I have this baby?'" he told her that she could have it if she submitted to the Caesarean. She then said, "`All right, go ahead.'"
He then told nurse Coyle to prepare for the Caesarean and telephoned Dr. Kauder between 12 midnight and 12:30 A.M. He testified also that it takes about one hour to one and one-half hours to prepare the operating room late at night, and to arrange for the attendance of an operating room nurse, who is on standby service, and an anesthetist.
Dr. Kauder and the anesthetist arrived in due course and the patient was taken to the operating room where a spinal *479 anesthetic was administered. According to the hospital records, at 12:55 A.M. Mrs. Parker's pulse weakened. She turned "ashen pale" and her blood pressure dropped to 80/60. Dr. Kauder said she complained of "shortness of breath and being unable to breathe." The anesthetist administered oxygen and "in another minute or so" called to Dr. Kauder that the patient was in extreme difficulty. He administered stimulants and stood by. Within another few minutes the patient had no heartbeat. Dr. Kauder made a very rapid incision into the uterus and delivered the baby within two minutes. He then put his hands into the diaphragm to massage the heart in an attempt to resuscitate the patient.
Mrs. Parker died at 1:13 A.M.; the baby was born at 1:15 A.M.; the cause of death was a pulmonary embolism.
While, as the trial judge noted on the motion for a new trial, there were factual conflicts concerning collateral matters, as, for example, when, where, and how often the defendant had met Mr. Parker, the basic operating facts, as hereinabove related, were not in dispute. Moreover, the hospital records fully substantiate Dr. Boffman's testimony regarding his several examinations of the patient between 7:30 P.M., when he first examined her, and 11:45 P.M. when he directed the nurse to prepare for the Caesarean. And it is significant that the doctor's progress note of 11:00 P.M. contains the information:
"Still advised operation which she refused, but later consented."
Whatever else may be said, there is no room for doubt that the patient withheld permission to perform the operation until 11:45 P.M. or thereabouts, contrary to the doctor's advice. His liability, therefore, must be assayed in the light of acceptance of this crucial fact, since the minds of reasonable men could not differ as to it.
In an action for negligence or malpractice against a physician, the plaintiff ordinarily is required to establish that defendant's treatment or care fell below the standard established *480 and recognized by the medical profession for the indicated condition of the patient, and the standard must be proven by expert medical testimony. Terhune v. Margaret Hague Mat. Hosp., 63 N.J. Super. 106, 111 (App. Div. 1960). The exception to this rule, i.e., a case where the asserted negligence consists of conduct so obviously wanting in reasonable care and skill that it may be so adjudged even by a layman, concededly, is not applicable to the present case. Cf. Becker v. Eisenstodt, 60 N.J. Super. 240, 246 (App. Div. 1960).
The obligation devolving upon plaintiff to prove through expert testimony a deviation by Dr. Boffman from recognized standards as a basis of liability, necessarily included a showing directly, or by legitimate inference, that the departure from a standard was causally connected with the death.
Plaintiff called as an expert Dr. David J. Graubard, a general surgeon whose qualifications to express an opinion in the field of obstetrics were found by the trial judge to be satisfactory. A lengthy hypothetical question was presented to the doctor which contained substantially the facts hereinabove recited, but with two notable exceptions. The doctor was asked to assume that defendant had estimated that the date of delivery would be July 31, 1957. This was based on a note in the hospital record to this effect, made of course, not as an estimate but as a statement of reality. The fact is (and this was known to plaintiff's attorney when the question was presented) defendant's office card of April 6, 1957 indicated August 16, 1957 was the estimated delivery date. As will shortly appear, this misleading assumption directly led to the opinion of Dr. Graubard that the defendant deviated from the standard pertaining to claim number one.
Furthermore, the hypothetical question contained no hint that decedent had revoked permission previously given for the performance of surgery, although plaintiff's attorney must have known that such revocation was a bulwark of the defense. The importance of the effect of this omission on Dr. *481 Graubard's opinion respecting claim number two clearly appears upon the cross-examination of the doctor, later narrated.
In response to plaintiff's hypothetical question, the doctor stated:
"In my opinion, there was a deviation from the normal standard in the care of this patient insofar as knowing fully well that she was a prior Caesarean that the dictum once a Caesarean always a Caesarean applies; and thereafter knowing the estimated date of delivery to be on or about July 31, 1957, at or about two weeks prior to the estimated date of delivery she should have been sent into the hospital to have a Caesarean section done."
and again:
"I will repeat my opinion as before. Number 1: That she should have had a Caesarean two weeks prior; that when she did go into labor on or about July 31, 1957, and when she was admitted to the hospital in labor at or about 6:30 P.M., that once Dr. Boffman knew that she was in the hospital and that she was in labor, a surgeon should have been gotten immediately in order to perform the Caesarean at that particular time. When it had failed that she had gone on into labor for such a prolonged period and with this particular respect I'm a little bit confused. Number 1, with the testimony that was read from the deposition to the effect that the head was presenting. When the head is presenting then an attempt should be made for delivery at that time. If it was a breech and the head was not presenting then a Caesarean was indicated, but we also have further conflict in the hospital records. Number 1, on admission the general condition is stated to be good and that the operating heart and the degenerating condition of the heart with myocardial damage, if it were myocardial damage, then, in my opinion, the spinal anesthesia should not have been given because it was contra-indicated.[*] Local anesthesia could have been attempted at that particular time for a Caesarean operation.
And so, in my whole opinion, it is that from the time of her admission to the hospital until the time of her death it was the deviation of not taking care of this patient in the proper manner to do the Caesarean section at the time of her admission or soon thereafter that led eventually to the death with pulmonary embolism." (Emphasis added)
While, as previously noted, claim number one is not before us, we reproduce the foregoing testimony in detail to demonstrate *482 that the basis of Dr. Graubard's opinion of deviation related entirely to (1) failure to hospitalize Mrs. Parker two weeks prior to the estimated delivery date, and (2) failure to promptly perform the Caesarean when she entered the hospital. As we have pointed out, the first branch of the opinion was founded upon the false premise that the estimated delivery date was July 31, rather than August 16, and the second branch was based on the equally false premise that defendant had Mrs. Parker's permission to perform the operation at all times after her admission, when in fact permission was withdrawn by her when the defendant first examined her at the hospital and, despite defendant's urgings, given only reluctantly four hours later.
On cross-examination, Dr. Graubard conceded that defendant could not properly order the operation performed until decedent consented thereto. Indeed, said the doctor, to do so would have subjected defendant to liability for assault and battery. However, when the refusal of the patient to permit the surgery was brought to Dr. Graubard's attention he stated that "the proper thing for Dr. Boffman to do would have been to advise the patient in the presence of witnesses that he was no longer responsible for her case, and to tell her to get another doctor."
We can readily understand the wisdom of this procedure in protection of a doctor's interests, but do not regard it as a standard of medical treatment, deviation from which subjects a doctor to civil liability, since such procedure obviously bears no relationship whatever to the patient's physical welfare. But even accepting this as a medical concept, we fail to find any causal connection between defendant's failure to withdraw from the case and decedent's demise. There is no indication whatever that had Mrs. Parker been left to her own devices, she would have been able to promptly obtain the services of another physician, or that if she had, she would have granted him the permission to operate which she steadfastly withheld from defendant.
*483 Excluding, as we must, Dr. Graubard's criticism of the injection of the spinal anesthesia by the anesthetist, his expert medical opinion of the malpractice of Dr. Boffman boils down to the premise that defendant was guilty of unwarranted delay in ordering the operation. Turning aside from the manifest inability of defendant to order it without decedent's permission, a more pervading question of proximate causation arises.
The patient died as a result of a pulmonary embolism  generically, a blood clot in the blood stream. What caused this condition to come into being? Was it the so-called delay? If so, where is the proof in this case of such connection? If it be found at all, it must be in Dr. Graubard's naked assertion that in the entire complex of the facts as given to him, the course of medical conduct pursued by the defendant "led eventually to her death with pulmonary embolism." There was no word of testimony from the witness to explain the physiological reactions of the decedent to the alleged delay, or of the anatomical effect of the delay on the pulmonary structure of decedent. The opinion, thus, was what is commonly described as a "net opinion."
The "net opinion" has long been the subject of criticism by the commentators. See 2 Wigmore on Evidence, § 682, pp. 805, 808 (3d ed. 1940). In the recent landmark case of Dwyer v. Ford Motor Co., 36 N.J. 487, 494-495 (1962), Justice Francis analyzed the subject thus:
"The legal conclusion of cause and effect is ordinarily dependent upon evidence of medical causation advanced by physician witnesses in the form of opinion based upon the facts and circumstances attending the heart attack. But we repeat that the mere assertion of reasonably probable contributory work connection by a medical witness cannot justify an award. The facts of the situation under examination in their totality must demonstrate causality by the greater weight of the credible evidence. In this area the reasons for the assertion are more important than the assertion itself. [citing case] Explanation of the physiological reactions of the diseased or ailing heart to the work strain in terms of sole or contributory cause and effect must generally be regarded as indispensable. The facts and circumstances surrounding the work effort and the heart attack, the medical opinion *484 as to connection between the two, and the explanation of the connection from a medical viewpoint must coalesce in support of a finding by the greater weight of the evidence that the effort was at least contributorily responsible in some material way for the attack."
While in Dwyer the court was writing in the context of a weight of evidence problem, the basic thesis that an opinion is no stronger than the facts which support it, and the medical explanation of its basis, is apposite here.
Thus viewed, the complete absence of explanation by Dr. Graubard of how, and in what manner, the supposed delay caused or contributed to the pulmonary embolism left an irreparable void in plaintiff's proof. Acceptable medical opinion of causation supported by expert explanation was an integral and indispensable part of plaintiff's case.
Consequently, we are obliged to conclude that plaintiff's case lacked the requisite expert opinion that in the known and uncontrovertible circumstances, defendant violated any medical standard or tenet which was proximately related to Mrs. Parker's death. Accordingly, defendant's motion for a judgment of involuntary dismissal should have been granted.
This determination makes it unnecessary to consider the trial errors which defendant urges as grounds for a new trial. The same is true of defendant's contention that the verdict was excessive.
Reversed, with the direction that judgment be entered in favor of the defendant.
NOTES
[*] It is not claimed that Dr. Boffman was chargeable with any negligence of which the anesthetist may have been guilty.