173 N.J. Super. 566 (1980)
414 A.2d 1350
EDWIN E. MASLONKA, GENERAL ADMINISTRATOR AND ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF PATRICIA (GERSTENBERG) MASLONKA, DECEASED; ON BEHALF OF THE ESTATE OF PATRICIA MASLONKA, DECEASED, AND EDWIN E. MASLONKA, INDIVIDUALLY, PLAINTIFF-APPELLANT,
v.
HENRY L. HERMANN, M.D., INDIVIDUALLY; VOLMAR MERESCHAK, M.D., INDIVIDUALLY; HENRY L. HERMANN, M.D., AND VOLMAR MERESCHAK, M.D., AS PARTNERS; TINA BASTINELLI, R.N., AND ELIZABETH BOYLE, R.N., INDIVIDUALLY, JOINTLY OR SEVERALLY, DEFENDANTS-RESPONDENTS, AND WARREN HOSPITAL, A CORPORATION OF THE STATE OF NEW JERSEY AND PHYLLIS MARZUOLLI, R.N., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 8, 1980.
Decided May 7, 1980.
*568 Before Judges CRANE, MILMED and KING.
*569 D. Scott Curzi argued the cause for appellant.
Stephen J. Tafaro argued the cause for respondents Henry L. Hermann, M.D. and Volmar Mereschak, M.D. (McDonough, Murray & Korn, attorneys).
Leonard Rosenstein argued the cause for respondent Tina Bastinelli (Feurerstein, Sachs & Maitlin, attorneys).
Robert M. Graham argued the cause for respondent Elizabeth Boyle, R.N. (Graham, Yuraski, Golden, Linter & Rothschild, attorneys).
The opinion of the court was delivered by KING, J.A.D.
This is an action brought to recover damages for the alleged wrongful postpartum death of Patricia Maslonka, N.J.S.A. 2A:31-1 et seq. Plaintiff, her husband, appeals from a grant of summary judgment entered in favor of defendant Drs. Hermann and Mereschak and nurses Bastinelli and Boyle.[1]
At the time the summary judgment motion was argued the record consisted of the Warren Hospital chart for decedent's admission on February 20, 1976, an affidavit of Marie Soto, another patient who shared decedent's room 413, the depositions of nurses Boyle and Bastinelli, Dr. Hermann, the attending physician, plaintiff Edwin Maslonka, decedent's husband, the medical reports of plaintiff's proposed expert witnesses, Gerson Weiss, M.D., of the New York University Medical Center, and nurse Alisan Bennett, a self-styled "consultant in health and related fields," and the pleadings.
Plaintiff relied principally upon the report of Dr. Weiss in resisting defendants' motion for summary judgment. Most of the facts pertinent to the ruling on defendants' motion are *570 summarized in Dr. Weiss' report as follows: Decedent was a 33-year-old woman with a past obstetrical history of three vaginal deliveries, the last in 1965. She had experienced one spontaneous miscarriage in 1961. The subject pregnancy was described as "benign" and her past medical history as "noncontributory to the present situation." Labor began spontaneously at 3:30 a.m. Decedent was admitted to Warren Hospital at 5:30 a.m. By 6:15 a.m. she was fully dilated. She was taken to the delivery room where, at 6:30 a.m., a spontaneous vaginal delivery occurred. The seven-pound, six-ounce child was normal and the anesthesia was stopped at 6:45 a.m.
At 7:30 a.m. decedent was transferred to semi-private room 413 for postpartum care. Following delivery, Methergine, a medication which has the occasional side-effect of increasing blood pressure in conjunction with the desired effect of contracting the uterus and decreasing uterine bleeding, had been given. Dr. Weiss interpreted the hospital chart as showing that decedent's blood pressure increased from 130/90 shortly after admission to 180/100 by 6:45 a.m.
At 7:30 a.m. the patient was noted to be bleeding moderately and passing clots. At 7:45 a.m. Dr. Weiss observed that the bleeding was noted to be moderate and the patient had vomited. By 8:30 a.m. the nurses' notes stated that decedent was pale and restless, with labored respiration. At this time no blood pressure or pulse could be obtained. A chest x-ray was reported as "highly compatible with massive pulmonary embolization." However, the electrocardiogram, according to Dr. Weiss, did not show changes compatible with this diagnosis. Emergency resuscitative efforts failed and the patient was pronounced dead at 9:30 a.m. An autopsy was offered by Dr. Hermann but was rejected by plaintiff husband about one-half hour after death. Dr. Hermann thereafter notified the County Medical Examiner, Dr. Marlott, of the death and of plaintiff's wish that no autopsy be performed. At 12:15 p.m. Dr. Marlott telephoned Dr. *571 Hermann and advised that no autopsy was necessary under the circumstances.
Dr. Weiss' report then stated the following analysis of the cause of death and defendants' alleged breaches of duty to the decedent.
While Mrs. Maslonka was not a high risk patient, very rapid delivery of a large baby in a multiparous woman over the age of 30 is usually grounds for at least a careful monitoring of the patient's condition in the post-delivery period. The observations of Mrs. Soto suggest that all was not right with the patient from the time she was placed in Room 413. It is possible that her bleeding was excessive, it is possible that she was having respiratory difficulties or internal bleeding  but we will never know these answers, nor will we ever know why Mrs. Maslonka died. If she had a massive pulmonary embolization, one would have expected electrocardiographic changes and one would have expected this to be an acute problem, rather one that was progressive for at least an hour while she was in Room 413. Other possibilities as to the cause of her death include things like an amniotic fluid embolization at the time of delivery which produced respiratory embarrassment and bleeding from intravascular coagulation, possible internal bleeding from a ruptured uterus which would result in a restless, agitated patient with a greater or lesser amount of external bleeding who would then have cyanosis and respiratory difficulty, or even a death from eclampsia. One might consider this in view of the fact that the patient was seen to have a seizure and it is possible from the record that the last blood pressure was indeed quite elevated. We will never know why Mrs. Maslonka expired because we do not have enough information. We will never know whether her death could have [been] prevented because we will not know what caused her death. The only fact that is quite clear from the record is that there is minimal documentation of her condition from the time of delivery to the time when she was found to be without blood pressure. During this critical postpartum period, not one blood pressure was recorded, not one pulse was taken, and not one observation of her condition was made except for the few statements in the nurses' notes.
It should be noted in Dr. Hermann's discharge summary that he was not at all clear as to the problem with Mrs. Maslonka after her blood pressure could not be obtained. He ordered intravenous pitocin which is the medication that one gives to increase uterine contractions if one feels there is excessive bleeding. This certainly then must have been one aspect of the case which one does not see from the chart. In addition, he ordered blood for type and crossmatch which *572 would indicate that he thought either she would come to immediate surgery or she was losing blood. He states that the cervix and the vagina were inspected but there is no notation as to whether the uterine cavity was inspected or whether there was evidence of internal bleeding. In light of the uncertainty as to the cause of death, it is quite surprising that the coroner did not request an autopsy. I am not familiar with the rules in [New Jersey] but certainly in New York City all maternal deaths are immediate medical examiner's case and an autopsy is required in every case. It has been shown again and again that this is the only way that one can learn and profit by previous poor results. Without the information obtained at an autopsy, all we can state for certain is that it is not clear as to why Mrs. Maslonka died. We can also unequivocally state that she was poorly attended in her postpartum period. [Emphasis added]
Nurse Bennett's report was also relied upon by plaintiff to resist the summary judgment motion. She characterized decedent as a "high risk patient despite the reference to the contrary in Gerson Weiss' report," because of her age, her problem pregnancy in 1961 and her "reproductive system conditions  chronic cervicitis in 1973 and endometrial polyp in 1961 in addition to right salpingoopharitis in 1969." Nurse Bennett concluded that the nurse-defendants' depositions and the nurses' notes evinced poor postpartum care because (1) the notes were poorly kept, (2) the notes were possibly made after the pronouncement of death, (3) the notes suggested poor communication among the nursing staff about the patient's care and condition, (4) the patient's vital signs were poorly monitored, and (5) "a nursing diagnosis ... could have led [nurse] T. Bastinelli to conclude hemorrhage was possible." Nurse Bennett concludes her analysis by saying that nurse Bastinelli "has not exercised all of the skills and knowledge that she should have gained as part of her basic professional training in behalf of the decedent, Patricia Maslonka. The NPN [nurses progress notes] depict her neglect of the decedent."
We accept plaintiff's contention that the experts' reports of Dr. Weiss and nurse Bennett establish a deviation from the *573 standard of postpartum care which these defendants owed to decedent. The problem inherent in plaintiff's thesis that the materials in opposition to the motion for summary judgment created a case for the jury is the absence of any expert opinion that a professional deviation probably was a cause of death. The record is barren of expert opinion on causation of death or of any factual analysis relating any breach of duty to the mechanism of death. As we view the record, unless we hold that this is a case of res ipsa loquitur, e.g., Steinke v. Bell, 32 N.J. Super. 67 (App.Div. 1954), or a case of common knowledge which we do not "believe to be beyond the ken of the average layman," Sanzari v. Rosenfeld, 34 N.J. 128, 143 (1961), or an extraordinary case where the burden of exoneration should be shifted to defendants upon the mere showing of a medical accident because some defendant must be at fault, under the doctrine of Anderson v. Somberg, 67 N.J. 291 (1975) (three dissents), the judgment in defendants' favor must be affirmed.
Every untoward result of medical treatment does not, without expert testimony, present a prima facie case of liability. Sanzari v. Rosenfeld, supra, 34 N.J. at 141. This court considered a somewhat similar case in Parker v. Goldstein, 78 N.J. Super. 472 (App.Div. 1963). There the plaintiff's decedent expired from a pulmonary embolism which occurred during Caesarean section. We stated that "[t]he obligation devolving upon a plaintiff to prove through expert testimony a deviation ... from recognized standards as a basis of liability, necessarily included a showing directly, or by legitimate inference, that the departure from a standard was causally connected with the death." Id. at 480. In Parker v. Goldstein, plaintiff produced a qualified expert who reached this conclusion as to the reason for death:
And so, in my whole opinion, it is that from the time of her admission to the hospital until the time of her death it was the deviation of not taking care of this patient in the proper manner to do the Caesarean section at the time of her *574 admission or soon thereafter that led eventually to the death with pulmonary embolism. [Id. at 481; emphasis supplied]
This court held that the expert's opinion as rendered was insufficient to create a jury issue on medical malpractice, stating:
The patient died as a result of a pulmonary embolism  generically, a blood clot in the blood stream. What caused this condition to come into being? Was it the so  called delay? If so, where is the proof in this case of such connection? If it be found at all, it must be in Dr. Graubard's naked assertion that in the entire complex of the facts as given to him, the course of medical conduct pursued by the defendant "led eventually to her death with pulmonary embolism." There was no word of testimony from the witness to explain the physiological reactions of the decedent to the alleged delay, or of the anatomical effect of the delay on the pulmonary structure of decedent. The opinion, thus, was what is commonly described as a "net opinion." [Id. at 483]
And this court there further stated:
While in Dwyer [v. Ford Motor Co., 36 N.J. 487, 494-495 (1962)] the court was writing in the context of a weight of evidence problem, the basic thesis that an opinion is no stronger than the facts which support it, and the medical explanation of its basis, is apposite here.
Thus viewed, the complete absence of explanation by Dr. Graubard of how, and in what manner, the supposed delay caused or contributed to the pulmonary embolism left an irreparable void in plaintiff's proof. Acceptable medical opinion of causation supported by expert explanation was an integral and indispensable part of plaintiff's case.
Consequently, we are obliged to conclude that plaintiff's case lacked the requisite expert opinion that in the known and uncontrovertible circumstances, defendant violated any medical standard or tenet which was proximately related to Mrs. Parker's death. Accordingly, defendant's motion for a judgment of involuntary dismissal should have been granted. [Id. at 484]
In Parker v. Goldstein, supra, plaintiff's expert did not explain how the death from pulmonary embolism was caused by or *575 related to the alleged negligent treatment. In the case before us Dr. Weiss is even uncertain about the cause of death and gives no reasoned conclusion on any nexus between the death and the alleged careless treatment.
Nor do we consider Anderson v. Somberg, supra, apposite. There plaintiff was injured when the cap of an angulated pituitary rongeur broke off in the spinal cord during a laminectomy. Plaintiff brought a malpractice-products liability action against the operating surgeon, the hospital, the medical supplier and the manufacturer of the rongeur. The Supreme Court held that in such a case, where the helpless plaintiff was fault-free and all potentially responsible parties were before the court, the burden of proof and risk of nonpersuasion was upon each of the defendants who were compelled to exonerate themselves before the jury or suffer a judgment for money damages. The Supreme Court's analysis in Anderson was premised on the conclusion that the broken rongeur of necessity was either defectively made or carelessly employed by the defendant surgeon. The Supreme Court held that all of the potential malefactors were before the trial court. The majority of the Supreme Court there stated:
In the ordinary case, the law will not assist an innocent plaintiff at the expense of an innocent defendant. However, in the type of case we consider here, where an unconscious or helpless patient suffers an admitted mishap not reasonably foreseeable and unrelated to the scope of the surgery (such as cases where foreign objects are left in the body of the patient), those who had custody of the patient, and who owed him a duty of care as to medical treatment, or not to furnish a defective instrument for use in such treatment can be called to account for their default. They must prove their nonculpability, or else risk liability for the injuries suffered. [67 N.J. at 298]
The Supreme Court then acknowledged the narrow application of the holding in Anderson v. Somberg, supra, to the extraordinary case, stating:

*576 ... The rule would have no application except in those instances where the injury lay outside the ambit of the surgical procedure in question; for example, an injury to an organ, when that organ was itself the object of medical attention, would not by itself make out a prima facie case for malpractice or shift the burden of proof to defendants. Farber v. Oklon, 40 Cal.2d 503, 254 P.2d 520, 524 (1953). [Id. at 302.]
We view the present situation as falling within "the ordinary case" wherein the law will not assist the plaintiff by shifting the burden of proof. Id. at 298. We cannot say on the record before us that there is any reasonable probability either that (1) one or more of defendants' alleged substandard treatment more likely than not caused Patricia Maslonka's death, or (2) that her death from uncertain cause was more likely than not the product of some defendants' malpractice. In Anderson v. Somberg, the Supreme Court found that there was a very high likelihood that either the defendant doctor was careless in the use of the rongeur or that the supplier or manufacturer of the rongeur was strictly liable for supplying a defective instrument. Only uncertainty, not probability, however, abounds on the record before us. We are therefore unable to say, as the Supreme Court did in Anderson v. Somberg, that plaintiff must necessarily prevail against some, or all, defendants.
We acknowledge plaintiff's contention that the affidavit of Marie Soto, the other patient in semi-private Room 413, is some evidence for submission of the case to a jury. Soto describes what she observed from 7 a.m. when Patricia Maslonka was brought to the room until about 9:15 a.m. when Soto was removed from the room. Soto described decedent as extremely restless, constantly turning and moving, delirious, and bleeding. During this period she observed that decedent received some nursing attention but that no doctor came to the room until just before 9:15 a.m. The affidavit is factually supportive of the contentions of Dr. Weiss and nurse Bennett that decedent received inadequate postpartum care. But the *577 Soto affidavit does no more for plaintiff's case than the experts' reports on the critical issue of whether the substandard care was a cause of death. Reading Marie Soto's nonexpert affidavit in the most indulgent light still does not make this a res ipsa case, "common knowledge" case, or bring it within Anderson v. Somberg, supra.
Plaintiff also contends that a probable violation of the State Medical Examiner Act, N.J.S.A. 52:17B-78 et seq., L. 1967, c. 234, overcomes the causation hurdle. The act states that "an investigation shall be conducted in the manner hereinafter described in the case of all human deaths ... within 24 hours after admission to a hospital." N.J.S.A. 52:17B-86. When such death occurs "it shall be the duty of the physician in attendance... to notify immediately the county medical examiner and the county prosecutor ... of the known facts concerning the time, place, manner and circumstances of such death." N.J.S.A. 52:17B-87. The statute then places the following duty on the county medical examiner:
... Immediately upon receipt of such notification, the said medical examiner or his deputy or assistant shall go to the dead body and take charge of the same. He shall fully investigate the essential facts concerning the medical causes of death and take the names and addresses of as many witnesses thereto as may be practicable to obtain, and, before leaving the premises shall reduce such facts, as he may deem necessary to writing and file the same in his office and which shall be made available to the county prosecutor at his request. The police officer present at such investigation, or if no officer be present, then the medical examiner shall, in the absence of the next of kin of the deceased person, take possession of all property of value found on such person, make an exact inventory thereof on his report and deliver such property to the police department of the municipality wherein the death occurred, which shall surrender the same to the person entitled to its custody or possession. The medical examiner shall take possession of any objects or articles which, in his opinion, may be useful in establishing the cause of death, and deliver them to the county prosecutor. [N.J.S.A. 52:17B-87]
*578 The statute thereafter imposes alternative responsibilities upon the county medical examiner.
If the cause of such death shall be established beyond a reasonable doubt, the county medical examiner shall reduce his findings to writing and promptly make a full report thereof to the State Medical Examiner and to the county prosecutor on forms to be prescribed by the State Medical Examiner for such purpose. If, however, in the opinion of the county medical examiner the State Medical Examiner, an assignment judge of the Superior Court, the county prosecutor or the Attorney General, an autopsy is necessary, the same shall be performed by (1) the State Medical Examiner or an assistant designated by him or by (2) the county medical examiner or a deputy or assistant county medical examiner provided either has the recognized training or experience in forensic pathology or by (3) such competent forensic pathologists as may be authorized by the State Medical Examiner.... [N.J.S.A. 52:17B-88]
A violation of the act is punishable as a disorderly persons offense. N.J.S.A. 52:17B-89.
Without dispute, Edwin Maslonka refused to give Dr. Hermann, the attending physician, permission to have an autopsy performed on his wife's body. He may have been upset when he made this decision but his emotional state cannot alter the fact. Plaintiff criticizes Dr. Hermann for not pressing harder for permission to do an autopsy, or for not insisting that the county medical examiner perform an autopsy without permission.
Dr. Hermann promptly notified the county medical examiner, Dr. Marlott, of the death. On deposition Dr. Hermann testified that he explained the case to the medical examiner "completely, I told him what my impression was [massive pulmonary embolization]" and that the husband would not consent to autopsy. Dr. Hermann described the following conversation with Dr. Marlott:
He asked me if the family wanted an autopsy and I said, "No, they don't, but I do."

*579 He says, "Well I don't think an autopsy is necessary and if we do one against their consent, they will probably sue."[2]
Under the statute the decision to perform an autopsy rests with the county medical examiner, not the treating physician, although the State Medical Examiner, the assignment judge, the prosecutor or the Attorney General may also authorize an autopsy. N.J.S.A. 52:17B-88. The undisputed facts show that Dr. Marlott concluded that an autopsy was unnecessary here. While the wisdom of his decision was surely questionable, we cannot hold that his decision, as made, operates to expose these defendants to civil liability for malpractice.
Dr. Hermann was in violation of the State Medical Examiner Act as he was obligated to notify immediately not only the medical examiner but also the county prosecutor. N.J.S.A. 52:17B-87. Dr. Marlott was also in violation of the statute because he did not "[i]mmediately upon receipt of such notification, ... go to the dead body and take charge of the same" and conduct a full investigation. However, these violations occurred after death and do not assist plaintiff's medical malpractice claim by establishing any causal relationship between the defendants' alleged professional misconduct and the death. It is axiomatic that a violation of a penal statute may be evidence of negligence for the jury to consider but proximate causation must connect the violation and the accident. Moich v. Passaic Terminal & Transp. Co., Inc., 82 N.J. Super. 353, 369 (App.Div. 1964). A permissible inference of causality is indispensable to admissibility. Mattero v. Silverman, 71 N.J. Super. 1, 9 (App.Div. 1961). Noncompliance with the State *580 Medical Examiner Act may be the subject of disciplinary action against the offending physician but does not here provide the missing causal link in a malpractice action.
The dissent contends that "the case was clearly not ripe for summary judgment." (P. 584). Plaintiff did not make this contention in the Law Division. To the contrary, plaintiffs' counsel stated at the argument on the motion: "I have no further expert reports that are going to be submitted, ... There is just not enough information to establish any further information as to the cause of death, Your Honor, and that is what I plainly said to you on numerous occasions. We don't know the cause of death."
There was no genuine issue of material fact below; all of the facts as contended by plaintiff were admitted for purposes of the motion. The judge was duty bound to rule on the summary judgment motion in this context. He could not decline to rule and hope that plaintiffs' cause would improve with age. "The judgment or order sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2; emphasis supplied.
The dissent concludes that the neglect of the defendants doctors and nurses was a "proximate cause of her bleeding to death." (P. 584). The dissent thus converts this into a "common knowledge" case not requiring expert testimony linking the alleged malpractice to the cause of death and relies on Becker v. Eisenstodt, 60 N.J. Super. 240, 246 (App.Div. 1960), which gives examples of these situations "which speak for themselves without the need of any expert testimony", i.e., a sponge left inside a patient's abdomen, the removal of or injury to an inappropriate part of the anatomy, dropping a tube down the windpipe, inflicting a serious burn or removing the wrong tooth. Where plaintiff's own qualified experts cannot say that it is more likely *581 than not that decedent exsanguinated as a result of the alleged negligent postpartum care by her doctors and nurses, and plaintiff's attorney admits in court that he can obtain no other experts on the point, we must agree with the Law Division judge's conclusion that "[i]t just would leave the complete  the case to go to speculation by the jury" if the summary judgment was not granted.
Where plaintiff's own proffered medical experts cannot say that to a reasonable degree of medical probability the defendant's alleged breaches of duty or any of them contributed to the death of Patricia Maslonka, we cannot say the matter is so obvious that a jury may decide it as within "the ken of the average laymen." Sanzari v. Rosenfeld, supra, 34 N.J. at 143.
Affirmed.
MILMED, J.A.D., dissenting.
The summary judgment dismissing plaintiff's complaint as against respondent doctors Hermann and Mereschak and nurses Bastinelli and Boyle should not have been granted for two obvious reasons, viz., (1) these defendants failed to sustain their burden "to exclude any reasonable doubt as to the existence of any genuine issue of material fact," Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74 (1954), and (2) there is sufficient evidence in the record from which a reasonable jury could properly find: (a) that, as plaintiff charged, respondent doctors and nurses abandoned decedent and failed and neglected to provide her with the professional care and treatment that she required, and that they were duty-bound to provide, in the "most critical and dangerous" postpartum period, and (b) that such abandonment and neglect were a proximate cause of the ensuing death. Beyond this, the trial judge failed in his obligation to detail reasons for his action, as required by R. 4:46-2 and R. 1:7-4.
Here we had a healthy 33-year-old woman, who had had three previous "normal full-term deliveries," admitted to defendant *582 hospital at 5:30 in the morning for delivery of another child. Four hours later, after giving birth to a healthy baby girl and being provided with practically no postpartum care and treatment although in an apparent deteriorating condition, she was pronounced dead.
In July 1975 Mrs. Maslonka employed Dr. Hermann to provide her with prenatal care, to deliver her baby and, following that event, to provide her with postnatal care. An hour after her admission to Warren Hospital, he delivered her healthy baby girl. The "Nurses Delivery Room Notes" show Mrs. Maslonka's pre-delivery blood pressure to be 138/90. The "Obstetrical Anesthesia Chart" shows that the delivery was concluded at 6:45 a.m., at which time her blood pressure reading was 180/100 to 180/95, which Dr. Weiss, plaintiff's expert, refers to as "dangerously high levels." Despite this, after the delivery of her child Mrs. Maslonka was given Methergine, a drug which Dr. Weiss states "has the property of sometimes increasing blood pressure as well as its desired effect of causing the uterus to contract vigorously and decrease uterine bleeding." At 7:30 a.m. Mrs. Maslonka was taken to a semi-private room in the hospital. The other patient in the room, Marie Soto, reported that "Dr. Hermann did not come in at any time after the delivery to check Patricia Maslonka's condition." Dr. Hermann says that at 8:30 a.m. the "other patient in the room [undoubtedly Mrs. Soto] called the nurses' attention to the fact that the patient [Mrs. Maslonka] `was restless.' The nurse saw the patient immediately, restless, labored respiration, color pale, somewhat cyanotic." Upon confirmation of these findings Dr. Hermann ordered the patient's blood pressure and pulse to be checked. However, by that time there was "[n]o blood pressure or pulse." Dr. Hermann "had the impression that the patient had had a pulmonary emobolus [sic]." She "had been put on critical prior to expiring, around 8:45 AM," and "was pronounced [dead] around 9:30 AM."
Dr. Mereschak, who along with Dr. Hermann was duty bound to provide Mrs. Maslonka with proper medical care and treatment, *583 says, in his certification, "I never saw plaintiff's decedent during her February 20, 1976 admission to Warren Hospital prior to her death." However, Mrs. Soto, in her affidavit, details first Mrs. Maslonka's efforts and then her own efforts to secure some professional care for Mrs. Maslonka, who appeared to her to be in "a half-conscious, delerious state," and was experiencing "very heavy bleeding." It is apparent from Mrs. Soto's account of what occurred that Dr. Mereschak did in fact make an appearance in the room shared by herself and Mrs. Maslonka, but only after Mrs. Maslonka's condition had thoroughly deteriorated. Thus, she says:
I called the nurses the third and final time. This was approximately ten minutes or more after the second call I made for Patricia. First I pulled the cable to call the nurses. Then right after pulling the cable, I was so concerned I got out of my bed, I rushed to the door and screamed for the nurses to come. By this time blood was covering both the front and the back of Patricia Maslonka's clothing and the sheets on her bed. This did not seem normal and no Doctor came to check her.
The same two nurses came into the room. One remained and the other nurse went to get a doctor. Doctor Mereschak came into the room. He then went to the telephone. Then an oxygen machine was brought into the room by other people. An oxygen mask was placed on Patricia's face. I then noticed that a needle with attached tubing looked like blood sample was stuck in the arm of Patricia.
It appears that until Dr. Mereschak made this belated entry into the room, no doctor had been there "to check Patricia." It was not until "quite a long while after Dr. Mereschak arrived" that Dr. Hermann made his appearance in the room. Mrs. Soto was removed from the room at about 9:15 a.m.
From the time Mrs. Maslonka was removed from the delivery room until her condition became so bad that there was "[n]o blood pressure or pulse," no professional, not a physician or a nurse, bothered to check these important life signs. Both Dr. Hermann and Dr. Mereschak say that although they "feel that Patricia Maslonka's death was caused by a massive pulmonary *584 embolus," they are "not able to state with reasonable medical certainty the cause of death" because "an autopsy was declined by the patient's husband." Dr. Hermann testified at depositions that about half an hour after Mrs. Maslonka died he told her husband, the plaintiff, in the presence of "another fellow":
... what we thought it probably was and how these things can occur, the others were agreeing with me, but I wanted an autopsy, it's a routine that I wanted an autopsy.
Plaintiff, in his deposition, gave quite a contrary version of what occurred. While he has a "personal dislike of the concept of autopsies," there was another reason why he "didn't want an autopsy." The following colloquy on cross-examination is enlightening:
Q Did you, at the time that the doctor told you that your wife had died, have a discussion with him as to what caused the death?
A I asked him what happened and he said the blood clot went to her lungs.
Q That was the sole extent of your discussion?
A That was the sole extent, really. Well, he came up to me and he said, Well, I have to ask you this question: Do you want an autopsy?
Q What did you say to that?
A No.
Q You said you didn't want an autopsy?
A No.
Q Did you discuss the decision you had to make as to whether or not you wanted an autopsy with Dr. Herman at the time that he asked you the question?
A I asked him how he felt about it and he felt that I really didn't need one because he more or less knew what it was and at the time, I didn't really think I should have had one done.
In his report Dr. Weiss seriously questions the respondent physicians' "feel[ing]" that the cause of death was "a massive *585 pulmonary embolus." He indicates clearly that the sparse records in the case suggest otherwise.[1] He states in part:
If she had a massive pulmonary embolization, one would have expected electrocardiographic changes and one would have expected this to be an acute problem, rather [than] one that was progressive for at least an hour while she was in Room 413.... The only fact that is quite clear from the record is that there is minimal documentation of her condition from the time of delivery to the time when she was found to be without blood pressure. During this critical postpartum period, not one blood pressure was recorded, not one pulse was taken, and not one observation of her condition was made except for the few statements in the nurses' notes.
It should be noted in Dr. Herman's discharge summary that he was not at all clear as to the problem with Mrs. Maslonka after her blood pressure could not be obtained. He ordered intravenous pitocin which is the medication that one gives to increase uterine contractions if one feels there is excessive bleeding. This certainly then must have been one aspect of the case which one does not see from the chart. In addition, he ordered blood for type and crossmatch which would indicate that he thought either she would come to immediate surgery or she was losing blood. He states that the cervix and the vagina were inspected but there is no notation as to whether the uterine cavity was inspected or whether there was evidence of internal bleeding....
Dr. Weiss concludes "unequivocally" that Mrs. Maslonka "was poorly attended in her postpartum period."
I cannot agree that the obvious failures in this case to comply with mandatory provisions of the State Medical Examiner Act, N.J.S.A. 52:17B-78 et seq., were without substance of effect. N.J.S.A. 52:17B-87 and N.J.S.A. 52:17B-88 clearly prescribe what must be done when a person dies "within 24 hours after admission to a hospital." N.J.S.A. 52:17B-86(d). Thus, N.J.S.A. 52:17B-87 states that upon such death:
... it shall be the duty of the physician in attendance, any law enforcement officer having knowledge of such death, the funeral director, or any other *586 person present, to notify immediately the county medical examiner and the county prosecutor of the county wherein the death occurred of the known facts concerning the time, place, manner and circumstances of such death. Immediately upon receipt of such notification, the said medical examiner or his deputy or assistant shall go to the dead body and take charge of the same. He shall fully investigate the essential facts concerning the medical causes of death and take the names and addresses of as many witnesses thereto as may be practicable to obtain, and, before leaving the premises shall reduce such facts, as he may deem necessary to writing and file the same in his office and which shall be made available to the county prosecutor at his request. The police officer present at such investigation, or if no officer be present, then the medical examiner shall, in the absence of the next of kin of the deceased person, take possession of all property of value found on such person, make an exact inventory thereof on his report and deliver such property to the police department of the municipality wherein the death occurred, which shall surrender the same to the person entitled to its custody or possession. The medical examiner shall take possession of any objects or articles which, in his opinion, may be useful in establishing the cause of death, and deliver them to the county prosecutor. [Emphasis supplied]
And N.J.S.A. 52:17B-88 provides:
If the cause of such death shall be established beyond a reasonable doubt, the county medical examiner shall reduce his findings to writing and promptly make a full report thereof to the State Medical Examiner and to the county prosecutor on forms to be prescribed by the State Medical Examiner for such purpose. If, however, in the opinion of the county medical examiner, the State Medical Examiner, an assignment judge of the Superior Court, the county prosecutor or the Attorney General, an autopsy is necessary, the same shall be performed by (1) the State Medical Examiner or an assistant designated by him or by (2) the county medical examiner or a deputy or assistant county medical examiner provided either has the recognized training or experience in forensic pathology or by (3) such competent forensic pathologists as may be authorized by the State Medical Examiner. A detailed description of the findings written during the progress of such autopsy, and the conclusions drawn therefrom shall thereupon be filed in the offices of the State Medical Examiner, the county medical examiner and the county prosecutor. It shall be the duty of any county medical examiner to call upon the State Medical Examiner or an assistant State medical examiner, or other person authorized and designated by the State Medical *587 Examiner, to make an examination or perform an autopsy whenever he deems it necessary or desirable, and it shall be the duty of the State Medical Examiner or assistant State medical examiner to perform such examination, except in such cases as a competent pathologist is so authorized by the State Medical Examiner to perform such autopsy. The necessary expenses for transportation of a body for autopsy by the State Medical Examiner or an assistant State medical examiner or an authorized pathologist and such reasonable fee payable to the authorized pathologist as has been approved by the State Medical Examiner for each autopsy such authorized pathologist may perform shall be paid by the State. [Emphasis supplied]
It is obvious that other than Dr. Hermann's perfunctory call to the county medical examiner, none of the above essential steps was taken. Having failed to comply with the terms of the statute in a most important respect, viz., notification of the county prosecutor, respondents cannot be given the protection they seek in their claim that the final death-determining factor is missing. We must assume that had the county prosecutor been properly notified he at least would have seen to it that there was full compliance with the pertinent provisions of the State Medical Examiner Act. Respondents may not, at the expense of plaintiff, seek comfort from their own dereliction.
It is also obvious from the record before us in this case, including the report of nurse Bennett, plaintiff's expert on nursing care, Mrs. Soto's affidavit, and the hospital records, that nurse Bastinelli and nurse Boyle, the "relief head nurse" on the floor during the critical postpartum period who helped nurse Bastinelli "change the patient," deviated from the standards of nursing care which they were duty-bound to observe in the circumstances.
In light of all of the above, I am satisfied that a reasonable jury could properly find from the evidence that respondent doctors and nurses abandoned Mrs. Maslonka in the critical post-delivery period and failed and neglected to provide her with the professional care and treatment that she required and that they were obligated to provide at the time; and that such *588 abandonment and neglect were a proximate cause of her bleeding to death. Plaintiff, who sues for damages for the wrongful death of a "wholly faultless" decedent, "should not fail in his cause of action by reason of defendants who have it within their power to prove nonculpability but do not do so." Anderson v. Somberg, 67 N.J. 291, 305 (1975), cert. den. 423 U.S. 929, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975). Here, as in Anderson, "the balance of equities requires no less." Id. Beyond this, plaintiff's case is "one within the field of legitimate inferences where a lay jury might properly conclude, from the established facts and in the absence of a satisfactory explanation by defendant[s]," that they, the respondent doctors and nurses, departed from standards of professional care and treatment required in the circumstances, and that such deviations were a reasonably probable cause of Mrs. Maslonka's death. See Becker v. Eisenstodt, 60 N.J. Super. 240, 247 (App.Div. 1960). From all of the circumstances disclosed in the record, a reasonable person could find that these respondents' want of due care "was more likely the probable cause" of the patient's death. Germann v. Matriss, 55 N.J. 193, 208 (1970).
Doubtless, in many cases, only a medical man may speak with authority as to the exact cause of death, or, to put the matter in another way, to say what caused the heart to stop, but every layman knows that it can be caused by excessive loss of blood. [Skeels v. Davidson, 18 Wash.2d 358, 139 P.2d 301, 304 (Sup.Ct. 1943)]
See, also, Flentie v. Townsend, 139 Kan. 82, 30 P.2d 132, 135 (Sup.Ct. 1934); Johnson v. Vaughn, 370 S.W.2d 591, 596-597 (Ky. 1963); Jackson v. Mountain Sanitarium & Asheville Agricultural School, 234 N.C. 222, 67 S.E.2d 57, 61-62 (Sup.Ct. 1951), reh. den. 235 N.C. 758, 69 S.E.2d 29 (Sup.Ct. 1952); Mehigan v. Sheehan, 94 N.H. 274, 51 A.2d 632, 633-634 (Sup.Ct. 1947); Wilson v. Martin Memorial Hospital, 232 N.C. 362, 61 S.E.2d 102, 105 (Sup.Ct. 1950).
*589 In light of the record in the case, which lends substantial support to plaintiff's charges that respondent doctors and nurses abandoned Mrs. Maslonka and failed and neglected to provide her with the professional care and treatment which was required in the circumstances, the "subjective elements of willfulness, intent or good faith" on the part of at least Dr. Hermann become "material" to plaintiff's claims.[2] In such case
... a conclusion from papers alone that palpably there exists no genuine issue of material fact will ordinarily be very difficult to sustain. The telltale factor of demeanor in the presence of the trier of fact often assumes such vital importance in such cases that the opposing party should generally not be denied the opportunity to have the moving [parties] appear on the witness stand before the trier of fact.... Indeed, subjective elements aside, a note of caution has been sounded as to any case where the opposing party must prove his claim or defense from what he can draw from the other party. [Judson v. Peoples Bank & Trust Co. of Westfield, supra, 17 N.J. at 76]
With no apparent in-depth examination of the evidence which was before him, and with no attempt to make findings and conclusions therefrom as he was obligated to do, see R. 4:46-2; R. 1:7-4, the trial judge decided to "grant the motion [for summary judgment] all the way around." He failed to be guided by essential criteria for determination of motions for summary judgment as set forth in Judson v. Peoples Bank & Trust Co. of Westfield, supra, e.g.,
All inferences of doubt are drawn against the movant in favor of the opponent of the motion. The papers supporting the motion are closely scrutinized and the opposing papers indulgently treated ... [at 75]
*590 The case was clearly not ripe for summary judgment. I would reverse the order under review and remand the matter to the Law Division for trial.
NOTES
[1] The case is still pending against the Warren Hospital and nurse Marzuolli, who did not join in the summary judgment motion below.
[2] "The rule is that where a nonofficial autopsy is performed without the consent of those who have the quasi right of property in the corpse, the person performing the autopsy or the one responsible therefor is liable in damages." 22 Am.Jur.2d, Dead Bodies, § 32 at 580; see, e.g., Aetna Life Ins. Co. v. Burton, 104 Ind. App. 576, 12 N.E.2d 360 (Ct.App. 1938).
[1] At this point it is important to again note that Mrs. Soto personally observed "very heavy bleeding."
[2] See Judson v. Peoples Bank & Trust Co. of Westfield, supra, 17 N.J. at 76.

In the second count of his complaint plaintiff charges Dr. Hermann with "willful" and "wanton" abandonment of decedent after the delivery of her child and, in the third count, he seeks a judgment against Dr. Hermann for punitive damages.